T.C. Memo. 2004-27

UNITED STATES TAX COURT

ESTATE OF EMANUEL TROMPETER, DECEASED,
ROBIN CAROL TROMPETER GONZALEZ AND JANET ILENE TROMPETER
POLACHEK, CO-EXECUTORS, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent[*]

Docket No. 11170-95.                February 4, 2004.


Robert A. Levinson and Avram Salkin, for petitioner.

Irene Scott Carroll, for respondent.


SUPPLEMENTAL MEMORANDUM OPINION

LARO, Judge:  This case is before the Court upon remand from

the Court of Appeals for the Ninth Circuit.  We issued our

initial report in this case on January 27, 1998, and filed that

_____

    *This Supplemental Memorandum Opinion supplements our prior
Memorandum Opinion in Estate of Trompeter v. Commissioner, T.C.
Memo. 1998-35, supplemented by 111 T.C. 57 (1998), vacated and
remanded 279 F.3d 767 (9th Cir. 2002).

report as T.C. Memo. 1998-35 (Trompeter I).  In Trompeter I, we set forth findings of fact as to the substantive issues arising from the notice of deficiency, and we set forth our Memorandum Opinion with respect to those issues.  Subsequently, on July 22, 1998, we issued a Supplemental Opinion in this case and filed that Supplemental Opinion as 111 T.C. 57 (Trompeter II).  Our Supplemental Opinion in Trompeter II decided the parties' disagreement over the mechanics of their computations under Rule 155.[1]  On March 18, 1999, we entered our decision in this case.

Through an opinion dated January 30, 2002, and reported at 279 F.3d 767, the Court of Appeals for the Ninth Circuit vacated our decision and remanded the case to us to "articulate sufficiently the basis for * * * [our] ruling on omitted assets and * * * [our] rationale with respect to the valuation of certain stock".  Id. at 769.  Specifically, the court directed us to clarify:  (1) The manner in which we arrived at a $4.5 million figure for omitted assets, including a description of the assets and the related fair market values which were included within that figure, (2) our reasoning and analysis behind the use of a 4-percent discount rate in valuing the series A exchangeable preferred stock (series A preferred stock) of Sterling Holding Co. (Sterling), and (3) the "well accepted present value

------

[1] Rule references are to the Tax Court Rules of Practice and Procedure.  Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code.

formulae" referenced and applied in our report.  Id. at 771-773.
The court also stated that, upon remand and following the
requisite clarification, we shall consider whether it is
appropriate to revisit our conclusions as to fraud.  Id. at
773-774.  The court noted that "In directing this approach, we do
not pass judgment on the Tax Court's multiple, careful, and
well-documented findings in this arena, nor do we suggest that a
remand will necessarily result in a different outcome with
respect to fraud."  Id. at 774.

We divide this Supplemental Memorandum Opinion into the
following three primary sections:  (1) "Omitted Assets",
(2) "Present Value Formulae and Discount Rate of Four Percent",
and (3) "Determination of Fraud in Trompeter I".  We made and set
forth in Trompeter I extensive findings of fact.  For purposes of
this Supplemental Memorandum Opinion, we repeat those findings
and find additional facts only to the extent necessary.  For
purposes of convenience and clarity, we include those findings in
our analysis.[2]  As we did in Trompeter I, we refer to Emanuel
Trompeter as the decedent, we refer to the decedent's estate as
the estate, and we refer collectively to Robin Carol Trompeter
Gonzalez (Gonzalez) and Janet Ilene Trompeter Polachek (Polachek)
as the coexecutors.  The parties routinely refer to the weight of

---

[2] We also in our analysis set forth various calculations
underlying our findings and our Supplemental Memorandum Opinion.
We round the results of those calculations as appropriate.

gold and gemstones as karat (kt.) and carat (ct.), respectively, and points. We note that one point equals 1/10 of a karat (or carat) and simply refer to the weight of gold and gemstones as karat (or kt.) and carat (or ct.), respectively.

I. Omitted Assets

We determined in Trompeter I that the coexecutors failed to include $4.5 million of assets in the estate's taxable estate (taxable estate). The Court of Appeals for the Ninth Circuit has directed us "to provide sufficiently detailed findings regarding the assets (including their valuation)" underlying the $4.5 million.

The decedent died on March 18, 1992. On the Federal estate tax return of his estate, the coexecutors valued the gross estate at $26,422,781 and reported that the taxable estate equaled $12,002,201. Respondent determined in the notice of deficiency that the coexecutors underreported the taxable estate by $22,833,693. As part of that determination, respondent determined that the taxable estate had omitted $14 million of assets.

Respondent's determination of the unreported assets was based mainly on a creditor claim filed against the estate by Joe Pasko (Pasko), the son of a former female acquaintance of the decedent, and a document (finder's fee document) dated October 17, 1990. Pasko's claim alleged that he was entitled to

a $1.4 million commission because, he alleged, the decedent had retained him to sell assets worth at least $14 million in return for a 10-percent commission. These assets, Pasko alleged, included the decedent's diamonds, jade and ivory collections, ancient Chinese artifacts, and handmade unique wool rug.[3] The finder's fee document, signed in the name of the decedent, provided that Pasko had the authority to sell for $20 million the decedent's "ancient ornamental Chinese artifacts for a period from Oct. 20 to Nov. 20, 1990 with no extension allowed. This lot also includes a hand made [sic] unique wool 4' x 8' rug of Moslem theme." The finder's fee document provided that Pasko would receive a commission equal to 10 percent of the sales price and that "Any and all commissions to be paid by the buyer as finders [sic] fee".[4] Although diamonds were not specifically mentioned in the finder's fee agreement, Pasko understood this agreement to include the decedent's diamonds.

---

[3] The estate's Federal estate tax return did not report that the decedent owned at his death any jewelry or loose gemstones. Nor were either of those items reported as a gift on any of the gift tax returns filed by or on behalf of the decedent, his trust, or the estate. The estate's Federal estate tax return also did not report that the decedent owned at his death a significant amount of jade, ivory, Chinese artifacts, or rugs. The coexecutors reported on the estate's Federal estate tax return that the value of the decedent's collection of ivory, jade, rugs, and other collectibles totaled $39,065.

[4] The fact that the buyer was liable for the 10-percent commission on $20 million means that the buyer would need to pay $22 million for the specified items in order for Pasko to collect his $2 million commission.

In addition to Pasko's claim and the finder's fee document, respondent based his determination of unreported assets on information furnished by certain individuals and on the value of assets seized from safe deposit boxes in the name of the decedent's trust (Trust) during the audit of the estate's Federal estate tax return. Respondent conversed primarily with four of the decedent's intimate friends and the decedent's two main suppliers of many of the assets collected by him. The first friend, Vivian Ballard Wong (Wong), had a personal relationship with the decedent from February 1987 through June 1991. Wong described to respondent a collection of jewels in the possession of the decedent in 1991. The other friends, Ira and Larry Goldberg and Robert Hesselgesser (Hesselgesser), generally relayed to respondent facts establishing that they had personal knowledge of the decedent's gemstone and jewelry collections, and they described to respondent certain gemstones and items of jewelry which they had seen in the decedent's possession near the time of his death. One of the decedent's suppliers, Dr. Nathan Mamiye (Mamiye) of New York, New York, confirmed selling loose gemstones, jewelry, jade, and ivory to the decedent and provided respondent with receipts reflecting a large dollar amount of diamonds which he (Mamiye) had recently sold to the decedent. The other supplier, Lloyds Fine Jewels (Lloyds) of New York, New York, provided respondent with receipts reflecting more than $1

million of sales which it had recently made to the decedent, and it informed respondent that those receipts did not necessarily reflect all of the sales which it had made to the decedent. Respondent's determination of the estate's unreported assets also was supported by respondent's examination of canceled checks of the decedent payable primarily to Mamiye and Lloyds, respondent's comparison of the items on the receipts furnished by Mamiye and Lloyds with the assets described by the individuals with whom respondent conversed, and respondent's seizure from the Trust's safe deposit box at Union Bank (safe deposit box) of unreported assets consisting of various bullion coins, 41 gold coins, 14 loose gemstones, and 11 items of jewelry.

Following our trial of this case and our detailed review of the record, we agreed with respondent that the estate had failed to report a significant amount of assets. The estate conceded that this amount was a little over $1 million. We were persuaded that the amount was much greater. We also were persuaded, however, that this amount was less than the $14 million determined by respondent. We proceeded to make an approximation of the fair market value of assets omitted from the taxable estate, recognizing that valuation is not an exact science and that the task before us was difficult in that the coexecutors had concealed information and assets from their accountants, respondent, and this Court.

The assets which we find were omitted from the taxable estate generally fall within three categories. First, there is approximately $1 million of assets which the estate concedes were unreported. Nineteen of these assets were seized by respondent from the safe deposit box and were sold at an auction held by Christie's, Inc. (Christie's).[5] Second, there are six other assets which respondent seized from the safe deposit box but which Christie's did not sell at auction. The parties agree that these six assets are includable in the taxable estate but disagree on their applicable fair market values. Third, there are still other assets as to which the parties dispute both fair market value and inclusion in the taxable estate. The coexecutors admit that they removed from the decedent's home after his death some of the assets included within this third category, but they deny the existence of most of the other assets. Respondent has never recovered any of these assets, but he has established to our satisfaction that they exist and are includable in the taxable estate. Respondent has done so through the introduction of credible testimony and documentary evidence that includes receipts and checks from purchases made by the decedent. We infer from this evidence that the decedent paid for and owned the assets listed in the receipts, see, e.g., Estate of

---

[5] The purchasers of the items auctioned by Christie's bought those items "as is".

Hodgdon v. Commissioner, 11 T.C.M. (CCH) 898, 1952 T.C.M. (P-H) par. 52,259 (1952), and that those assets, not having been shown to have been relinquished by the decedent, were includable in the taxable estate, see, e.g., Estate of Bograd v. Commissioner, T.C. Memo. 1988-34, affd. 887 F.2d 1084 (5th Cir. 1989). We also infer from this evidence that the taxable estate includes other assets which were not listed in the receipts but which the decedent possessed and controlled near the time of his death and were not shown by the estate to have been relinquished by him. As we stated in Trompeter I, the assets in this third category "consist mainly of gems, jewelry, furniture, and a music collection." Estate of Trompeter v. Commissioner, T.C. Memo. 1998-35. As detailed below, these assets also include cash at home, 31 coins, rugs, jade, and ivory.

We set forth below by these three categories the assets which we find were omitted from the taxable estate and the fair market values which we find as of the applicable valuation date.[6] These fair market values represent our findings as to "the price

---

[6] The coexecutors elected to have the estate valued as of the alternate valuation date of sec. 2032(a). Thus, the applicable valuation date is generally Sept. 18, 1992. See generally sec. 20.2031-1(b), Estate Tax Regs. ("The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section.").

at which the property would change hands between a [hypothetical] willing buyer and a [hypothetical] willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; see also Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982). See generally Bank One Corp. v. Commissioner, 120 T.C. 174, 302-306 (2003), for a detailed discussion of the criteria underlying a determination of fair market value. In deciding these fair market values, we note that:

> The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) includible in the decedent's gross estate is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile of the decedent would be purchased by a dealer in used automobiles. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of property. * * * [Sec. 20.2031-1(b), Estate Tax Regs.]

Respondent retained an expert, Charles I. Carmona (Carmona), Graduate Gemologist in Residence, Accredited Senior Appraiser, who, on direct examination, testified through his written report, see Rule 143(f)(1), that he had ascertained the applicable fair market values of 25 of the seized assets (25 seized assets) and that those values were as stated in that report. (We attach hereto as appendix A Carmona's description of each of the 25 seized assets, its appraised value, and, in the case of 19 of the assets sold by Christie's at auction, its auction price.) We considered Carmona to be helpful to our valuations of some of the disputed assets, and we relied on his opinion, which was credible and without contradiction.

Carmona examined and researched each of the 25 seized assets and opined that the fair market value of those assets for Federal estate tax purposes was the "average price that each item in its current (used) condition might resell to the public in its most common retail outlets in the Estate's local area".[7] He opined that the proper resale prices for jewelry were the prices obtained at a retail jewelry store and that the proper resale prices for loose gemstones were their wholesale prices increased

---

[7] Carmona noted in his report that "the [25] items listed have been examined and researched to the best of my ability, but not under ideal conditions (cramped quarters, time constraints, artificial light)." When Carmona examined the 11 items of jewelry included within the 25 seized assets, he observed that most of those items still had tags on them and that none of the items showed any signs of wear.

by the commissions charged by brokers on their sales of gemstones to the public. He opined that the public usually buys jewelry at retail from jewelry stores that sell estate jewelry, that the majority of buyers at public auctions are dealers, that the lowest level of sales prices for jewelry is found at auction, and that jewelry usually passes from the dealer to the public through retail jewelers with a dealer-to-retail-jeweler markup of 25 to 50 percent over cost and a retail-jeweler-to-public markup of 50 to 100+ percent over cost. He opined that the wholesale prices paid for gemstones by brokers was best ascertained from personal experience and comparable sales and offers to sell. He opined that a broker's commission on a sale of loose gemstones to the public was typically 15 to 25 percent of the wholesale price.

The assets which we find were omitted from the taxable estate and the fair market values which we find for these assets are as follows:[8]

Assets Stipulated as to Existence
  and Fair Market Value

| | |
|---|---|
| St. Gauden and other bullion coins seized by respondent from the safe deposit box | $50,000 |
| 41 gold coins (different than the St. Gauden and bullion coins just listed) seized by respondent from the safe deposit box | 104,500 |

_____

[8] We provide below a brief description of the 25 seized assets and list in parenthesis at the end of each description the number and letter that corresponds to Carmona's specific description in appendix A.

The decedent's gun collection 2,085
19 assets seized by respondent and sold
  at auction:
   1.  Lady's 18-kt. yellow gold,
      sapphire, and channel-set
      diamond ring (2a) $1,800
   2.  Lady's 18-kt. yellow gold, ruby,
      and channel-set diamond ring (2b) 1,800
   3.  Lady's 14-kt. yellow gold and
      diamond ring (2c) 20,000
   4.  14-kt. yellow gold and diamond tie
      tack (2f) 4,500
   5.  Lady's 18-kt. yellow gold and
      diamond necklace (2h) 32,000
   6.  Lady's 18-kt. yellow gold, emerald
      and diamond necklace (2i) 19,000
   7.  One loose round-brilliant-cut
      1.9-ct. diamond (3c) 9,600
   8.  One loose round-brilliant-cut
      2.01-ct. diamond (3b) 7,500
   9.  One loose emerald-cut 3.35-ct.
      diamond (3n) 25,000
  10.  One loose heart-shape 4.03-ct.
      diamond (3g) 7,500
  11.  One loose round-baratiant-cut
      4.32-ct. diamond (3m) 105,000
  12.  One loose octagon-ct. 5.01-ct.
      diamond (3d) 35,000
  13.  One loose round-brilliant-cut
      6.62-ct. diamond (3f) 20,000
  14.  One loose round-brilliant-cut
      6.65-ct. diamond (3j) 24,000
  15.  One loose emerald-cut 7.57-ct.
      diamond (3e) 30,000
  16.  One loose round-brilliant-cut
      7.74-ct. diamond (3k) 27,000
  17.  One loose square-emerald-cut
      11.13-ct. diamond (3i) 44,000
  18.  One loose octagon-shape 18.28-ct.
      diamond (3l) 210,000
  19.  One loose octagon-cut 40.02-ct.
      diamond (3a) 220,000   <u>843,700</u>
                 1,000,285

Six Seized Assets Disputed as to Fair
  Market Value

| | | | |
|---|---|---|---|
| 1. | Lady's 18-kt. yellow gold, sapphire, and diamond necklace (2d) | 4,400 | |
| 2. | Lady's 18-kt. yellow gold, ruby, and diamond necklace (2e) | 5,800 | |
| 3. | Cultured pearl necklace with 14-kt. white gold clasp (2g) | 400 | |
| 4. | Lady's 18-kt. yellow gold, emerald, and diamond necklace (2j) | 19,000 | |
| 5. | Lady's 18-kt. yellow and white gold, opal, and diamond pin/pendant combination with treated opal necklace (2k) | 7,600 | |
| 6. | One loose cushion-shape-natural 18.2-ct. sapphire (3h) | 9,100 | 46,300 |

Assets Disputed as to Fair Market Value and
  Inclusion in the Taxable Estate

| | |
|---|---|
| Music collection | 50,000 |
| Sofa table | 4,416 |
| Three Baker's tables[1] | 6,624 |
| "Thousand dollar" watch | 1,000 |
| Cash at home | 50,000 |
| 31 coins | 425,847 |
| Rugs | 59,530 |
| Jade collection | 247,500 |
| Ivory collection | 1,500,000 |
| Loose gemstones: | |
| Emerald-cut 2.08-ct. diamond | 15,510 |
| Emerald-cut 2.28-ct. diamond | 17,010 |
| Round-cut 3.04-ct. diamond | 47,436 |
| Masterpiece 4.39-ct. diamond | 106,680 |
| Heart-shaped-baguette five-ct. diamond | 75,000 |
| Round-cut 5.22-ct. diamond | 78,150 |
| Round-cut 7.75-ct. diamond | 35,800 |
| Eight-ct. emerald | 16,150 |
| Two other emeralds | 32,300 |
| Two opals | 32,300 |
| 18-ct. ruby | 7,500 |
| 18-ct. sapphire | 6,000 |
| Genuine masterpiece 18.02-ct. sapphire | 9,100 |

Bracelets:
 18-kt. gold bracelet with 9.5-ct. diamond 12,400
 Tennis bracelet with one-ct. diamonds    108,000
 Six other diamond tennis bracelets       187,140
 Ruby bracelet                              5,800
 Sapphire bracelet                          4,400
Necklaces:
 Diamond necklace                          13,330
 18-kt. gold necklace w/ 26.73-ct. diamond 74,000
 30.02-ct. graduated-diamond necklace      66,404
 Ruby necklace                             13,330
 Sapphire necklace                         13,330
 Turquoise necklace                        21,250
Rings:
 Man's diamond pinkie ring                  4,500
 Man's three to four-ct. diamond ring      15,750
 Ruby ring                                  6,665
 Sapphire ring                              6,665
Diamond stud earrings                       9,000
Three to four-ct. diamond tie tack         15,750
Pins:
  Ruby pin                                  5,800
  Sapphire pin                              4,400
Pendants:
 18-kt. gold, ruby, and diamond pendant    18,400
 Sapphire pendant with round diamonds      15,000
Furniture                       26,051 3,471,218
                                     4,517,803[2]


[1]As discussed below, Polachek used the term
"Baker's" to describe three tables which she removed
from the decedent's home.  We understand from this
reference that these tables were manufactured by
Baker's Furniture, Inc., and refer to the tables as
"Baker's tables".

[2]We round this number to $4.5 million.

We now discuss the specifics of our decision as to the

existence and fair market value of the disputed assets.

A.  Seized Assets Disputed as to Fair Market Value

Before Christie's auctioned the 25 seized assets, it had

assigned to each of these assets a lower and upper estimated

value. (We attach hereto as appendix B a list of each item's lower and upper estimated values, agreed reserve (i.e., the minimum price at which an asset could be sold by Christie's at auction), auction price (in the case of the 19 items sold at auction), high bid (in the case of the six items not sold at auction), and Carmona's appraised value.[9]) These lower and upper estimated values are estimates by Christie's of the likely amounts that bidders would bid at an auction for the assets. These estimated values do not reflect the requirement of Christie's that buyers also pay to Christie's on each sale a commission equal to 15 percent of the first $50,000 of the purchase price and 10 percent of any excess. Nor do the estimates (or the ultimate sales prices) include sales tax that is payable on the sales.

The 25 seized assets consist of 11 items of jewelry and 14 loose gemstones. Of those assets, six items of jewelry and 13 loose gemstones were sold at the auction held by Christie's. The remaining six assets (i.e., five items of jewelry and one loose gemstone) did not sell at the auction.

The six items of jewelry sold at auction for a total auction price (exclusive of buyer's commissions) of $79,100. Christie's

---

[9] The descriptions of the assets in appendix B also are cross-referenced to the specific descriptions in Carmona's report by way of the number and letter in the parenthesis following the description.

estimated that these six items had a total lower estimated value of $70,000 and a total upper estimated value of $107,500. Carmona ascertained that the fair market value of these six items totaled $146,200. Carmona's total fair market value for these six items is 84.83 percent (($146,200 - $79,100)/$79,100) greater than the total of their auction prices.

The 13 loose gemstones sold at auction for a total auction price (exclusive of buyer's commissions) of $764,600. Christie's estimated that these 13 gemstones had a total lower estimated value of $488,000 and a total upper estimated value of $656,000. Carmona ascertained that the fair market value of these 13 gemstones totaled $1,100,000. Carmona's total fair market value for these 13 gemstones is 43.87 percent (($1,100,000 - $764,600)/$764,600) greater than the total of their auction prices.

Christie's estimated that the five items of jewelry which did not sell at auction had a total lower estimated value of $28,000 and a total upper estimated value of $39,500. Carmona ascertained that the fair market value of these five items of jewelry totaled $37,200. Christie's estimated that the one loose gemstone which did not sell at auction had a lower estimated value of $14,000 and an upper estimated value of $16,000. Carmona ascertained that the fair market value of this single gemstone was $9,100.

We find that, as of the applicable valuation date, the fair market value of each of the six assets which did not sell at auction equaled its fair market value as ascertained by Carmona. In other words, we find that the fair market values of the five items of jewelry which did not sell at auction totaled $37,200 and that the fair market value of the single gemstone that did not sell at auction was $9,100. We find that the individual values of these six assets are as follows:

### Jewelry

| | |
|---|---:|
| Lady's 18-kt. yellow gold, sapphire, and diamond necklace | $4,400 |
| Lady's 18-kt. yellow gold, ruby, and diamond necklace | 5,800 |
| Cultured pearl necklace with 14-kt. white gold clasp | 400 |
| Lady's 18-kt. yellow gold, emerald, and diamond necklace | 19,000 |
| Lady's 18-kt. yellow and white gold, opal, and diamond pin/pendant combination with treated opal necklace | 7,600 |
| | 37,200 |

### Gemstone

| | |
|---|---:|
| One loose cushion-shape-natural 18.2-ct. sapphire | 9,100 |
| | 46,300 |

We consider Carmona to be most helpful to our valuation of each of these six assets. Carmona testified as to jewelry in general that the typical buyer of jewelry at auction is a dealer and that jewelry usually passes from a dealer to the public through retail jewelers with a dealer-to-retail-jeweler markup of 25 to 50 percent over cost and a retail-jeweler-to-public markup of 50 to 100+ percent over cost. As to the six items of jewelry

which sold at auction for a total price of $79,100, a markup of
that total price by the minimum dealer-to-retailer and retail-
jeweler-to-public markups referenced by Carmona (i.e., 25 and 50
percent, respectively) results in a total retail price of
$148,312.50 ($79,100 + ($79,100 x .25) = $98,875; $98,875 +
($98,875 x .50) = $148,312.50)),[10] or, in other words,
approximately the same as the total fair market value of $146,200
ascertained by Carmona for those items.

Carmona testified as to gemstones in general that the public
usually buys a gemstone at an amount that equals the gemstone's
wholesale price plus 15 to 25 percent of the wholesale price.  As
to the 13 gemstones which sold at auction for a total price of
$764,600, we do not find in the record any persuasive evidence
that would indicate whether the auction price of those gemstones
represents their wholesale price.  We would imagine that,
generally speaking, the auction price of a gemstone is at least
15 percent less than its wholesale price.  Otherwise, why would a
broker/dealer pay a double digit commission at auction (15
percent of the first $50,000, 10 percent thereafter) to buy a
gemstone "as is", when the broker/dealer could buy a "similar"
gemstone from a wholesaler without the payment of a commission?

---

[10] We note that $148,312.50 is 87.5 percent greater than
$79,100 (($148,312.50 - $79,100)/$79,100) and that the 25- and
50-percent minimum markups referenced by Carmona translate into a
single 87.5-percent markup (.25 + (.50 + (.25 x .50)) = .875).

When we increase the $764,600 total auction price paid for the 13 gemstones by the $95,440 of commissions payable to Christie's on the respective sales,[11] and then mark up the sum of $860,040 ($764,600 + $95,440) to reflect the 15- to 25-percent commissions referenced by Carmona, we arrive at a range of retail value for the gemstones from $989,046 ($860,040 x 1.15) to $1,075,050 ($860,040 x 1.25). This range approximates the $1.1 million total fair market value ascertained by Carmona for the 13 gemstones.

We recognize that none of the six assets in question actually sold at auction for even the lower estimated value ascertained by Christie's. We do not consider any of these lower estimated values to be a proper measure of the price at which a hypothetical willing buyer and a hypothetical willing seller would consummate a sale of those assets. The auction was a single auction that included many precious gemstones and many valuable items of jewelry. The mere fact that each of the six assets offered for sale at the auction did not sell there for even its lower estimated value does not mean under the facts herein that its fair market value is necessarily less than its lower estimated value. Cf. CTUW Hollingsworth v. Commissioner,

---

[11] As to the total auction price of $764,600 paid for 13 loose gemstones, $379,600 was subject to a 15-percent commission and $385,000 was subject to a 10-percent commission (($379,600 x .15) + ($385,000 x .10) = $95,440).

86 T.C. 91, 101 (1986) (unaccepted offer to purchase land is not conclusive evidence of the value of the land). We also do not know, for example, whether the bidders at the auction consisted of actual consumers who were willing to buy an item at its fair market value or, as Carmona persuasively opined in the setting of jewelry auctions, primarily dealers who bid substantially less than fair market value in order to resell their purchases at a fair market value price which, to them, would be inclusive of a businessman's profit. In fact, we know little about the composition or number of bidders at the auction, let alone the tone of the actual bidding that took place. On the record before us, we simply cannot conclude as to any of the six items in question that the auction market is the "market * * * in which such item is most commonly sold to the public". Sec. 20.2031-1(b), Estate Tax Regs.

We are mindful that this Court has on occasion determined that an item's auction price was its fair market value. E.g., Estate of Scull v. Commissioner, T.C. Memo. 1994-211; Lightman v. Commissioner, T.C. Memo. 1985-315. In contrast with the case at hand, the auction markets in those cases were shown to be the appropriate retail markets for the assets under consideration, and the sales at auction were shown to be to the ultimate consumer. Where as here such is not the case, the Court has rejected equating the auction price of an item with its fair

market vale.  E.g., <u>McGuire v. Commissioner</u>, 44 T.C. 801 (1965) (prices paid at auction for art, furnishings, and other personal property did not reflect fair market value in that the bidders at auctions were generally wholesalers or dealers who were buying for resale); cf. <u>Stollwerck Chocolate Co. v. Commissioner</u>, 4 B.T.A. 467, 471 (1926) (auction price determined to be fair market value where evidence established that "There were some twenty buyers present [at the auction], seven or eight of whom made bids for the property."). We also note as to the facts at hand that the auction by Christie's involved assets seized by respondent to satisfy a perceived Federal tax obligation, which, in turn, suggests that the auction at hand had an element of a forced sale.  A forced sale is inconsistent with the willing seller requirement of fair market value and is not probative of fair market value.  See, e.g., sec. 20.2031-1(b), Estate Tax Regs.

We also are mindful of Rev. Proc. 65-19, 1965-2 C.B. 1002. As relevant herein, that revenue procedure applies to "certain items of tangible personal property which, while generally available to a member of the general public at retail establishments, frequently are obtained by members of the general public at a public auction".  Under this revenue procedure, the Commissioner presumes for purposes of section 20.2031-1(b), Estate Tax Regs., that the auction price of an item of tangible

personal property is its retail sales price. By extension of this presumption, the fair market value of an item of tangible personal property not sold at auction could be presumed to be no greater than its high bid at auction.

We do not believe that the presumption of Rev. Proc. 65-19, supra, applies to set conclusively the fair market value of the six assets in question. Five of those assets are items of jewelry. We find pursuant to Carmona's testimony that the public does not frequently purchase jewelry at auction. As to the sixth item, a loose 18.2-ct. sapphire, we are unable to find in the record that loose sapphires are typically sold to the public at auction. However, even if the presumption were to apply to one or more of these six assets, we conclude from the record that the high bids for those six assets are not reflective of their retail sales price. We bear in mind especially our findings herein as to the much higher prices which the decedent paid to Mamiye and Lloyds for the comparable and other items shown on the receipts.

We recognize that respondent stipulated that the applicable values of 19 of the 25 seized assets were the same as their auction prices and that those prices were in most instances lower than Carmona's appraised values. In valuing the assets in dispute, we do not find in the record that respondent has presumed under Rev. Proc. 65-19, 1965-2 C.B. 1002, that the fair market values of the 19 assets equaled their auction prices. In

fact, given that the auction prices stipulated by respondent did not reflect the commissions paid by the buyers, we conclude to the contrary. See Estate of Scull v. Commissioner, T.C. Memo. 1994-211 (when the appropriate retail market for an item is the auction, the fair market value of an auctioned item equals its auction price plus buyer's commission). See generally 2003 Fed. Tax Coordinator 2d (RIA), vol. 21, par. P-6009, at 42,252. More importantly, the fact that these assets sold at auction, presumably to dealers, suggests in this case that respondent's pursuance and the Court's redetermination of a fair market value for any of the 19 assets greater than its auction price would have made little or any difference in the deficiency in that the estate would have been entitled to deduct the additional value as an administration expense. See sec. 20.2053-3(d)(2), Estate Tax Regs.; see also Estate of Joslyn v. Commissioner, 566 F.2d 677 (9th Cir. 1977), revg. 63 T.C. 478 (1975).

B. Assets Disputed as to Fair Market Value and Inclusion in The Taxable Estate

1. Overview

The decedent was a longtime, avid collector of various valuable items which included specially minted, limited edition gold coins, precious gemstones, expensive jewelry, exquisite rugs and furniture, and guns.[12] He was a wealthy man who enjoyed the

---

[12] The decedent's guns (approximately 10) were not as
(continued...)

finer and more expensive things in life, and he had the financial means to fulfill his desire of collecting only the best pieces of the items which he collected. He was an astute and shrewd businessman who was very knowledgeable about and proud of his collections, and he received much enjoyment flaunting his possessions before others when he entertained at home or was a guest at someone else's home.

In early 1988, the decedent divorced Sylvia Trompeter, his wife of 37 years. They had separated on August 8, 1984, and the decedent's relationship with the coexecutors suffered as a result of his separation and ensuing divorce. The decedent following his divorce began devoting most of his time to his collections and, more specifically, to the fulfillment of his intent to own the world's finest pieces in the categories of items which he collected. The decedent at that time had various female friends, one or more of whom lived with him on different occasions. In addition to his motive of investment, the decedent collected many of the referenced assets to impress these women.

In early 1991, the decedent learned that he had terminal cancer, and he relayed this information to the coexecutors. At that time, Gonzalez, the decedent's oldest daughter,[13] began

---

[12](...continued)
valuable as the other assets which he collected.

[13] When the decedent died, Gonzalez and Polachek were 38 and
(continued...)

discussing with the decedent the specifics of the assets which he owned. Gonzalez, and to a lesser extent Polachek, became knowledgeable of the specifics of the decedent's vast wealth, and Gonzalez in conjunction with Polachek deliberately undertook to maximize their receipt of that wealth by, among other things, undervaluing his assets and excluding assets from the taxable estate.

Receipts and canceled checks show that the decedent bought from Mamiye and Lloyds (primarily at its Fifth Avenue store in New York) various assets which included diamonds, rubies, sapphires, and emeralds, either loose or as pieces of jewelry, and ivory, jade, rugs, furniture, and Chinese artifacts. We set forth these receipts and checks in four categories.

### a. Receipts From Lloyds to the Decedent

Lloyds gave to the decedent nine receipts reflecting $1,421,000 of merchandise that it sold to him during 1988 and 1989. Three of the nine receipts relate to purchases of $650,000 made on January 16, 1988. One of the nine receipts relates to purchases of $235,000 made on May 4, 1988. One of the nine receipts relates to purchases of $235,000 made on May 5, 1988. Three of the nine receipts relate to purchases of $276,000 made

---

[13](...continued)
33 years old, respectively.

on December 5, 1988.  One of the nine receipts relates to purchases of $25,000 made on May 4, 1989.

The writing on the receipts is not always easily readable. We set forth below our reading of that writing.  We have been unable to decipher one word (apparently the surname of a collector) that appears in the receipts in four different places. We show that word as "illegible".  The nine receipts read as follows:

Receipt No. 562, dated January 16, 1988

1    ADHOXO = Masterpiece Genuine Diamond
     40 ct 2 pt. Wt. Emerald Cut

2    Z20118 Heart Shape Baguette Diamond 5 ct Wt.
     ~~ZHOXO~~ 60X0X Round Cut, Diamond 5 ct 22 pt Wt.

3    Z2014 PHOXO = Genuine Pear Shape Diamond
     8 ct 69 pt Wt. Baguette 4 ct 75 pt Wt.  Necklace

4    Z2008 H8HOX Emerald 6 ct. 48 pt. Wt.
     Baguette 32 ct. 50 pt Wt.

5    GIA certificate, Emerald Cut 3 ct. 35 pt Wt. Clarity 1F,
     Color F, report # 5186298 POAOX = AU

6    GIA certificate, Round 3 ct. 4 pt Wt. Clarity VVS2
     Color I # 5186303 = ALOXO

7    Bracelet, Diamond 9 ct. 5 pt Wt. BK003
     12400-              SOXO 18 Ct.  U. Gold

8    Diamond, Heart 4 ct. 03 pt Wt. Fine Quality =
                     RHROX

9    Diamond, Emerald Cut # 5181374
     2 ct 08 pt Wt. GVSI = RASOX =

10   Diamond ~~Round~~ Emerald Cut 2 ct 28 pt Wt.
     RPOXO F VSI

## Receipt No. 563, dated January 16, 1988

```
11     Diamond # 5175260 2 ct 01 pt. Wt. Round #
       1F-1=   RAOXO     Magnificent Diamond Round

12     Diamond, Round 1 ct. 90 pt. Wt.
       E VS2 =  ROROX

              including Furniture
                        Bulk for all          650,000.00

                   Ck 1 @ 250,000.00  1-16-88
                   Ck 2   200,000.00  2-28-88
                   Ck 3   200,000.00  3-15-88
```

## Receipt No. 564, dated January 16, 1988

```
       9 pc   Mother of Pearl Dining Room set
  Set         W/8 chairs

       2      Curio Cabin Mother of pearl inlay
              With Lite, Lock, Shelfs [sic]

  HOX         Black, Artwork Laqueor [sic] Desk
  AOX            "    Ming Chair
  AHO         Carved pedestal = For table

   RNO        48 inch Beveled glass  48 inch
       6      Chairs, Corner Work Mother of Pearl
     RNH      ea for table set
  LOX= 1      Sofa table for Back of couch
  RXO  1      Chair Laqueor [sic] Black

                   Complete for all          650,000.00

                             Bulk
```

## Receipt No. 596, dated May 4, 1988

```
  Ivory   erotic giga          RPHOX
    "       Wise Mens          RPHOX
    "       Erotic             RXOXO
    "         "                RSHOX
    "       40 tall 3 figure   ROXOX

       Delivered 26 items
       for Bulk Lot special              235000

  Diamond Necklace
  Sapphire  "
  Ruby      "
  Ruby      Ring
  Sapphire  "
  Masterpiece Diamond      4 ct 39 pt
  Faint Blue

          Bulk Lot Special          235000.00
```

## Receipt No. 597, dated May 5, 1988

```
Ruby      18 ct. AR00 7500-  0.60
Sapphire  "      "  6000    "
Diamond   " Necklace  "
  Dia 26 ct. 73 pt.    "   74000-   PO77
Sapphire pendant  # 6886 w/ Diamonds Rd.
KHM 55=  18 ct.,  15000-
Ruby Pendant Diamond 072 pt. Ruby
18 ct. gold    18400-  # 6885 Bagget KHM 58
Ivory Maiden
                     Bulk for                    235000.00

     ck 812   Paid by Checks   100000-  5-5-88     100000-
        813    "                        6-10-88     67000-
        814    "                        7-12-88     67500-
                                  for am in full   235000.00
                         received 3 cks   #812-813 814
```

## Receipt No. 565, dated December 5, 1988

1. AHO Turquoise Necklace, 11mm 30 inch
   Wall of IVORY Art piece    NSO
        in exchange of Netsukie [sic[1]]

2. YPOXO= Ivory Crab in Cage

3. PSOOX= Magnificent pair, Genuine Jade
   Tempess Urns, Black Jade Fish Waves 32 1/2 x 12 3/4 3 in.

4. the Royal Kingdom in Temple Urns
   APOXO = w/21 inch x 16 x 42  top 31 x 14

5. Jade Screen Picture Hand Carved = 17 1/2 x 25 1/2
   With Wood Frame 23 x 38 pair

6. Ivory Boat, PLHO = 22 x 16=x 15 1/2
        Hand Carved

7. Ivory Wall 11 x 7 1/2 x 3 <NSO>

8. Genuine Ivory, apples 5 3/4 x 3 pair

9. Silk Hand Made [illegible] Dragon Hand Made
   4-5 x 7 feet, 93000L

10. Round Diamond 1F 7ct. 75 pt. Wt.

11. Diamonds graduated Necklace total wt.
    30 ct 02 pt Wt., Fine Quality

[1]A netsuke (the plural of which is netsuke or netsukes, not netsukie) is "a small and often intricately carved toggle (as of wood, ivory, or metal) used to fasten a small container to a kimono sash". Merriam-Webster's Collegiate Dictionary 780 (10th ed. 1999).  We understand the decedent to have received the

referenced turquoise necklace and wall of ivory art piece in exchange for netsukes and not as consideration for any of the $276,000 purchase price related to the receipts of Dec. 5, 1988.

## Receipt No. 566, dated December 5, 1988

12    Ceylon[1] Sapphire -- genuine Masterpiece
18 ct 02 pt Wt.

13    Pair Diamond Stud Ear Ring

14    tree of Life, Pure Silk, Hand Made
3 x 5 feet = [illegible] Colection [sic] = 91500

15    Silk, prayer Rug        "   91800 3 x 5 By [illegible]
Hand Made pure Silk, Gold Mesheda

16    Rose Wood Curio Stand 9400L = 4-piece
2 tables  9200L

17    Netsukie [sic] cases 9360E

18    5 assorted Beige Hand Made, Pure Silk
3x5  2x4  6x9  3x5  2x4

19    Isfahan Hand Made Fine Quality Wool
5 x 7 = feet

20    a true Masterpiece aprox 6 x 9 feet
Hand Made  922000 Hand Made
Pure Silk

21    Genuine Ivory Eagle   arrived broken

    1"Ceylon" was the former name of Sri Lanka. Merriam-Webster's Collegiate Dictionary, supra at 1456, 1516.

## Receipt No. 567, dated December 5, 1988

to 21 assorted items

    Bulk for all      276000-

                 Paid in full

With Furniture Delivered
   with Eli Ezra [illegible]
   and Complete Order
Jade Urns 45000- to apraisel [sic] pre

Unnumbered receipt dated May 4, 1989

    Nestkies [sic] collection

        25,000.00

These nine receipts do not reflect all of the merchandise which the decedent purchased from Lloyds.  Lloyds was unable to locate all of its receipts relating to purchases by the decedent.[14]

### b.  Checks From the Decedent to Lloyds

From 1987 through 1989, the decedent wrote Lloyds the following 13 checks for his purchase of merchandise:

| Check Number | Check Date | Check Amount |
| --- | --- | --- |
| 696 | October 14, 1987 | $2,000 |
| 697 | October 14, 1987 | 15,000 |
| 711 | October 28, 1987 | 80,500 |
| 731 | December 4, 1987 | 276,000 |
| 765 | January 16, 1988 | 250,000 |
| 774 | February 18, 1988 | 200,000 |
| 775 | April 14, 1988 | 200,000 |
| 812 | May 5, 1988 | 100,000 |
| 813 | June 10, 1988 | 67,000 |
| 814 | July 12, 1988 | 67,500 |
| 846 | August 15, 1988 | 27,500 |
| 992 | May 4, 1989 | 25,000 |
| 4751 | April 15, 1989 | 275,000 |
| | | 1,585,500 |

Check numbers 765, 774, 775, 812, 813, and 814, totaling $884,500 in payments, are referenced in the receipts just discussed.  The

---

[14] We note as to the nine referenced receipts that Lloyds first gave the decedent receipt numbers 562, 563, and 564, then, approximately 4 months later, gave him receipt numbers 596 and 597 and then, approximately 7 months after that, gave him receipt numbers 565, 566, and 567.

other checks, representing the balance of $701,000, reference no receipt in the record, nor are referenced in those receipts.

### c. Receipts From Mamiye to the Decedent

Two receipts which Mamiye gave to the decedent reflect the decedent's purchase from Mamiye of $485,000 of diamonds in 1989. The first receipt reflects the decedent's February 16, 1989, purchase from Mamiye of a round 6.62-ct. diamond with VS1 clarity, a round 6.65-ct. diamond with VS1 clarity, and a round 7.81-ct. diamond with VS1 clarity. The receipt states that the decedent purchased these items at the "bulk special" price of $125,000. The receipt states that the decedent was required to pay $50,000 down and $75,000 in 30 days, and that the decedent had "left as trade 7 ct. 74 pt. Round until sold, and to be set' for sale and ownership to Ed'".

The second receipt reflects the decedent's May 5, 1989, purchase from Mamiye of a yellow 5.01-ct. diamond, an 8.53-ct. diamond, and an 11.13-ct. diamond. This receipt states that the decedent purchased these items in a "Bulk Lot" for a "Special" price of $175,000 and that the price for the diamonds, if purchased separately, would have been $75,000, $85,000, and $200,000, respectively.

In 1989, the decedent made a $100,000 pledge to a charity. In connection therewith, the decedent donated the 7.81 and 8.53-ct. diamonds to the charity during 1990 and 1991. The other

four referenced diamonds purchased from Mamiye were included in the assets seized by respondent from the safe deposit box.

### d.   Checks From the Decedent to Mamiye

During 1988 and 1989, the decedent wrote Mamiye the following checks for the purchase of merchandise:

| Check Number | Check Date | Check Amount |
|---|---|---|
| 764 | Jan. 16, 1988 | $6,000 |
| 954 | Feb. 16, 1989 | 50,000 |
| 981 | Apr. 6, 1989 | 75,000 |
| 982 | Apr. 9, 1989 | 45,000 |
| 993 | May 5, 1989 | 175,000 |
| 1080 | Sept. 7, 1989 | 7,000 |
| 1183 | Dec. 22, 1989 | 15,000 |
|  |  | 373,000 |

Check numbers 764, 982, 1080, and 1183 do not relate to any receipt in the record.

### e.   Relationship of Receipts and Checks to Disputed Assets

As to the assets whose existence the parties do not dispute, some, but not all of these assets, are listed in these receipts. As to the assets whose existence the parties do dispute, the receipts reveal that 22 items which are not included in the 25 seized assets were purchased by the decedent from Lloyds but were not reported on the estate's Federal estate tax return.[15]   We

---

[15] Although the two receipts from Mamiye do not list any item the existence of which is disputed by the parties, these receipts reflect only the sales from Mamiye to the decedent of the six loose diamonds.

find that the decedent retained ownership of these 22 assets at his death.  These 22 assets are:

1.  Emerald-cut 2.08-ct. diamond
2.  Emerald-cut 2.28-ct. diamond
3.  GIA certificate round 3.04-ct. diamond
4.  Masterpiece 4.39-ct. diamond with faint blue color
5.  Heart-shape-baguette five-ct. diamond
6.  Round-cut 5.22-ct. diamond
7.  Round 7.75-ct. diamond
8.  18-ct. ruby
9.  18-ct. sapphire
10.  Ceylon genuine masterpiece 18.02-ct. sapphire
11.  18-kt. gold bracelet with 9.05 ct. diamond
12.  Diamond necklace
13.  18-kt. gold necklace with 26.73-ct. diamond
14.  30.02-ct. graduated-diamond necklace
15.  Ruby necklace
16.  Sapphire necklace
17.  Turquoise necklace 11mm, 30 inches long
18.  Ruby ring
19.  Sapphire ring
20.  Pair of diamond stud earrings
21.  18 kt. gold, ruby, and diamond pendant
22.  Sapphire pendant with round diamonds

The checks and receipts from Lloyds also reveal that 18 items were either not reported on the estate's Federal estate tax return or, to the extent that they were so reported, were not included in the taxable estate at their fair market values as of the applicable valuation date.  We find that the decedent retained ownership of these 18 assets at his death.  These 18 assets are:

1.  Sofa table with 48-inch beveled glass
2.  Silk handmade dragon rug, four-five x seven feet
3.  Silk handmade tree of life rug, three x five feet
4.  Silk handmade prayer rug, three x five feet
5.  Silk handmade beige rug, two x four feet
6.  Silk handmade beige rug, two x four feet
7.  Silk handmade beige rug, three x five feet

8. Silk handmade beige rug, three x five feet
9. Silk handmade beige rug, six x nine feet
10. Isfahan handmade fine quality wool,
     five x seven feet
11. Silk handmade masterpiece rug, six x nine feet
12. Three items of jade
13. Various items of ivory
14. Mother-of-pearl inlay dining room set with a carved
     pedestal and 14 chairs
15. Two curio cabinets with mother-of-pearl inlay
16. Black artwork lacquer desk and chair
17. Black Ming chair
18. Four-piece, two table rosewood curio stand

Testimony and documentary evidence also establish the existence of other unreported assets which were includable in the taxable estate. Hesselgesser, who like the decedent was a collector, testified credibly that he met with the decedent on a few occasions to discuss and inspect the decedent's collections of guns, gold coins, jewelry, ivory, and music. Hesselgesser's testimony persuades us that the decedent had "several" collections of ivory and that the decedent in the summer of 1991 owned several large diamonds (e.g., 30 and 40 carats), several tennis bracelets, and several large necklaces with emeralds and diamonds. Hesselgesser's wife testified credibly that the decedent near his death possessed several diamond necklaces and an extensive music collection. The decedent's friend, Joanne Standard (Standard), testified credibly that the decedent possessed eight to 10 tennis bracelets, some of which had one-ct. diamonds all around the bracelet, "fabulous" emerald necklaces,

and all kinds of "lovely" jewelry.[16]  Testimony also establishes that the decedent owned various other items of jewelry and numerous diamonds, emeralds, and opals.  In sum, the testimony and documentary evidence establish that the decedent owned the following 18 assets which were not included in either the 25 seized assets or the known receipts and that were not reported on the estate's Federal estate tax return:

1. Music collection consisting primarily of reel-to-reel tapes
2. Three Baker's tables
3. "Thousand dollar" watch
4. Cash at home
5. 31 coins
6. Various pieces of jade
7. Various pieces of ivory
8. One eight-ct. emerald and two other emeralds
9. Two opals
10. Tennis bracelet with many one-ct. diamonds
11. Six other diamond tennis bracelets
12. Ruby bracelet matching seized ruby necklace and ring
13. Sapphire bracelet matching seized sapphire necklace and ring
14. Pinkie ring with three to four-ct. diamond
15. Man's three- to four-ct. diamond ring
16. Tie tack with three- to four-ct. diamond
17. Ruby pin matching seized ruby necklace and ring
18. Sapphire pin matching seized sapphire necklace and ring

We find that the decedent retained ownership of these 18 assets at his death.

---

[16] The decedent generally collected sets of jewelry that included necklaces, earrings, brooches/pins, and bracelets.

2.  Specific Assets

     a.  Music collection

When he died, the decedent owned a music collection consisting of reel-to-reel tapes (and to a lesser extent records) and three or four tape players.  The decedent had been collecting reel-to-reel tapes for approximately three decades, and his life's goal was to own the best collection of reel-to-reel tapes which money could buy.  The decedent's music collection was unique and of fine quality, consisting mainly of music from the 1920s and 1930s and including tapes of the famous Italian tenor Caruso and numerous other tapes of music from Latin America through music of the present day.  The decedent kept his tapes at home in several rooms.  In one room, in particular, the room where he routinely listened to his tapes on a high quality, highly sensitive sound system, the decedent covered one wall completely with his tapes.

Henry Schiffer (Schiffer) was the decedent's accountant and a long-time friend.  Once or twice a month, Schiffer would visit the decedent at his home to handle his accounting requirements or simply to converse with him in his music room or in his gazebo. For estate tax purposes, Schiffer prepared a one-page document entitled "ED TROMPETER ASSET LIST (NOT INCLUDING COINS) AS OF FEBRUARY 21, 1992".  This document listed Schiffer's understanding of some (but not all) of the assets owned by the

decedent as of that date and each asset's estimated fair market value.  Schiffer generally obtained these estimates by asking the decedent his opinion as to each asset's value.  Beforehand, Schiffer had advised the decedent that he should be conservative in estimating value for this purpose because the higher the value, the greater the estate tax.  The document listed that the decedent's music collection had an estimated fair market value of $50,000 as of February 21, 1992.

Gonzalez took the decedent's music collection to her home in Florida after he died, and the coexecutors did not report any value for this collection on the Federal estate tax return.  We find on the basis of Schiffer's document and testimony that the fair market value of this collection was $50,000 as of the applicable valuation date.  We are mindful that the fair market value of this collection could be significantly higher than $50,000 given the voluminous size of the collection, the decedent's earnest desire to have the finest collection of reel-to-reel tapes which money could buy, the decedent's financial ability to fulfill that desire, and Schiffer's advice to the decedent to estimate the value of the listed assets conservatively.

### b.  Baker's tables/sofa table

By her own admission, Polachek removed three Baker's tables and a long sofa table from the decedent's home after he died.

While Polachek suggested that these tables were of minimal dollar value, we find it more likely that these assets had a significant dollar value in light of the decedent's wealth, lifestyle, and desire to own (and be seen as owning) only the best of everything.  In fact, the value of these four assets caused Polachek to expend her time, effort, and money to transport them from the decedent's home in Southern California to her home in Northern California.[17]  Given our added understanding of the location and value of the decedent's home,[18] as well as the fact that he was a flamboyant individual who filled his home extensively with the finest, most beautiful, and most valuable pieces of art, artifacts, gemstones, and jewelry (as well as a noteworthy collection of music recordings), we simply do not see the decedent sparing an expense when it came to furnishing his home with tables and other furniture.  Such is especially so given that the decedent regularly entertained at his home, that he purchased at least some of his home's furniture from the Fifth

[17] The estate has not established that Polachek transported any of these four assets to her home for sentimental reasons.  In fact, the record leads us to a contrary conclusion.

[18] The decedent owned a four-bedroom, 3,928 square-foot one-story home in Thousand Oaks, California.  It was sited on approximately one acre of land and, when built in 1975, had two two-car garages and a double car port.  (The decedent when he died owned a 1992 Lexus four-door sedan and a 1991 Jeep Cherokee four-wheel drive, the blue book values of which were $28,500 and $19,050 as of the date of his death.)  The decedent for purposes of Schiffer's statement had valued his home at just over $1 million.

Avenue location of Lloyds, and that he obviously paid a significant amount of money to ship that furniture cross-country to his home in California.

We find as of the applicable valuation date that the fair market values of the sofa table and each of the three Baker's tables were $4,416 and $2,208, respectively.[19] Lloyds gave to the decedent three sequentially numbered receipts for his purchases of January 16, 1988, totaling $650,000. Receipt number 564, the last of these three receipts, listed nine pieces of furniture purchased by the decedent. Neither party has suggested that this sale was not a valid, arm's-length sale, and we consider it as such.[20] The parties stipulated that item numbers 1, 3, 4, 5, and 8 on receipt number 562 and the only two items on receipt number 563 had as of the applicable valuation date a total fair market value of $320,600.[21] As discussed infra pp. 56-58, 62-63, we find that the fair market values of the remaining items on receipt number 562 totaled $245,506 as of the

---

[19] We understand the sofa table to be much larger than each of the Baker's tables, which we understand are the same size. Although Polachek suggested that the sofa table had a broken leg that made it worthless, we find this suggestion incredible.

[20] The decedent also must have considered this sale to have been on good terms as he proceeded afterwards to frequent Lloyds continually and to spend large sums of money there.

[21] Those items correspond respectively to item numbers 19, 5, 6, 9, 10, 8, and 7 on our list of assets stipulated as to existence and fair market value.

applicable valuation date.[22]  When we take into account credible testimony in the record to the effect that the value of jewelry and gemstones has remained virtually the same throughout the relevant time period, we conclude that the balance of the $650,000 sales price, i.e, $83,894 ($650,000 - ($320,600 + $245,506)), must be attributable to the nine items of furniture on receipt number 564.

The nine items of furniture basically consist of:  (1) A mother-of-pearl inlay dining room set with a carved pedestal and 14 chairs, (2) two curio cabinets with mother-of-pearl inlay, (3) a black artwork lacquer desk and matching chair, (4) a sofa table with 48-inch beveled glass, and (5) a black Ming chair.  On the basis of our perception of the value of the items in these five categories, we assign the following weights to these categories to apportion the $83,894 amongst them:  8, 4, 4, 2, and 1, respectively.[23]  In that the sum of these weights totals 19 (8 + 4 + 4 + 2 + 1 = 19), we apportion 8/19, 4/19, 4/19, 2/19, and 1/19 of the $83,894 to the respective categories.  Our apportionment of the $83,894 to the five categories is $35,324,

---

[22] We find that the fair market values of the two diamonds in item number 2 were $75,000 and $78,150 and that the fair market values of the items in item numbers 6, 7, 9, and 10 were $47,436, $12,400, $15,510, and $17,010, respectively.

[23] In other words, we decide that the item in category 1 was worth twice as much as each of the items in category 2 and 3, four times as much as the item in category 4, and eight times as much as the item in category 5.

$17,662, $17,662, $8,831, and $4,415, respectively.  We decide

that, as of the applicable valuation date, a date that is

approximately 5 years after this furniture was purchased, the

fair market value of each of these categories is 50 percent of

the amount which we apportion to it, or, in other words, $17,662,

$8,831, $8,831, $4,416, and $2,208, respectively.[24]  We decide

that the sofa table taken by Polachek is the sofa table in

category 4.  We decide that the applicable fair market value of

each of the Baker's tables is 1/2 of the fair market value of the

sofa table, i.e., $2,208 ($4,416/2), and that the fair market

values of the three Baker's tables on the applicable valuation

date totaled $6,624 ($2,208 x 3).

We are mindful that the estate's Federal estate tax return

contains an "appraisal" opining that the decedent's home was

filled mainly with minimal value assets.  That document was

prepared by Butterfield & Butterfield (Butterfield) on or about

May 13, 1993, and purports to list the fair market values as of

---

[24] We believe that a 50-percent reduction of the apportioned
amounts adequately compensates for the fact that the decedent
purchased this furniture approximately 5 years before the
applicable valuation date and that furniture in general tends to
decrease in value over time.  Judging by the prices which the
decedent paid for this furniture, we conclude that it was
furniture of the highest quality.  We also note that the decedent
purchased this furniture in "Bulk" at a "special" price that
apparently was less than the total retail price of that furniture
if each piece of it had been purchased separately.  The decedent
also was an elderly man who tended to live either alone or with
one other person, a factor which we believe would conserve the
condition of the furniture.

March 18, 1992, and September 18, 1992,[25] of 161 single or groups

of assets which were viewed by Butterfield within the decedent's

home.  The document states that only three single assets were

worth more than $1,000,[26] that 87 of the 161 assets were worth

less than $100, and that 143 of the 161 assets were worth less

than $500.  The document lists, for example, that the fair market

value of a "CHINESE MOTHER-OF-PEARL INLAY ROSEWOOD DINING SET"

was $800, that the fair market value of a "PAIR OF CHINESE

MOTHER-OF-PEARL INLAY ROSEWOOD DISPLAY CABINETS" was $1,500, that

the fair market value of "SIX CHINESE MOTHER-OF-PEARL INLAY

ROSEWOOD CORNER CHAIRS" was $300, that the fair market value of a

"CHINESE BLACK LACQUER GILT DECORATED ARMCHAIR" was $50, and that

the fair market value of a "PAIR OF CHINESE CARVED ROSEWOOD

RECTANGULAR STANDS" was $800.  The document also lists that the

fair market values of 10 rugs were as follows:[27]

---

[25] In all cases, the amount shown as fair market value is the same on both dates.

[26] Specifically, Butterfield appraised a "PAIR OF MASSIVE CHINESE IVORY VENEER COVERED URNS" at $4,000, a "PAIR OF LARGE CHINESE CARVED JADE PLAQUES" at $2,500, and a "LARGE CHINESE CARVED IVORY TUSK ON WOOD STAND" at $1,400.

[27] Butterfield later in 1993 sold each of these rugs at auction.  The amounts paid by the buyers for these rugs (including applicable commission) is shown in the column to the right.  We list the amounts in that column for completeness and do not rely on these amounts to value any of the disputed assets herein.

| Description | Appraised Value | Auction Price |
|---|---|---|
| Oriental rug (Rams) | $200 | 312.50 |
| Chinese silk rug (Banzai Trees), 34 x 56 inches | 300 | 200.00 |
| Chinese silk rug (Dragons), 49 x 86 inches | 300 | 312.50 |
| Chinese silk yellow rug, 56 x 28 inches | 300 | 37.50 |
| Chinese silk yellow rug, 68 x 98 inches | 150 | 150.00 |
| Chinese silk yellow rug, 49 x 74 inches | 300 | 137.50 |
| Chinese silk yellow rug, 56 x 28 inches | 150 | 37.50 |
| Indian rug, 55 x 86 inches | 400 | 250.00 |
| Chinese silk red and yellow rug, 62 x 36 inches | 300 | 125.00 |
| Chinese silk rug (Tabriz design), 72 x 106 inches | 600 | 3725.50 |

We give little regard to this "appraisal". We do not believe that an astute, strong-minded, self-made multimillionaire like the decedent, who indisputably collected only the finest and most valuable gold coins, gemstones, and items of jewelry, and who received enormous pleasure from flaunting his possessions before others, would purchase assets with such minimal values as listed by Butterfield.[28] Nor does the appraisal state the rationale underlying its low values; it merely recites a brief general description of the asset with its proffered value. We also know little about the appraiser (e.g., her credentials) or the terms or conditions underlying the appraisal. We do know, however, that the appraiser generally walked through the decedent's home, eyed most of the items in the home, and

_____

[28] We also find that many of Butterfield's listed values are considerably low when compared to the actual price for similar assets per the receipts. Although we understand that some of the items appraised by Butterfield ultimately sold at prices near the appraised values, we do not know who bought the items at those prices (e.g., dealer or consumer). Nor do we know whether Butterfield had been instructed by the coexecutors to sell those items for at least a set minimum value.

appraised them on the spot.  We also know that Gonzalez testified that she took three of the decedent's rugs to her home in Florida, that she later had those rugs appraised in Florida by what she described as a "legitimate company", and that the company appraised the rugs at $4,000.  Gonzalez effectively conceded at trial that Butterfield did not recognize the value of those rugs and did not meaningfully appraise them.[29]

### c.  Thousand dollar watch

Schiffer testified that the decedent wore a "thousand dollar" watch.  The coexecutors did not report any watch on the estate's Federal estate tax return.  On the basis of Schiffer's testimony, we find that the fair market value of the decedent's "thousand dollar" watch was $1,000 as of the applicable valuation date.

### d.  Cash at home

The coexecutors reported on the estate's Federal estate tax return that all of his money (exclusive of coin collections) as of the applicable valuation date was held in financial institutions.[30]  The coexecutors did not report any cash that the

---

[29] For similar reasons, we also give little weight to the fact that Christie's wrote a letter to Gonzalez stating that it was unable to prepare an insurance appraisal of some of the Chinese artifacts in the decedent's home because "Most of these items are of modern or late production.  * * *  I would suggest that you either call in a local appraiser or insure at the cost prices."

[30] The coexecutors reported that the decedent had at financial institutions two money market accounts and two checking
(continued...)

decedent had at home.  The decedent kept cash at home in a burlap bag secured in a large safe in his den, and he routinely went to the safe when he needed money to spend.  The decedent was very private about the contents of this safe, and he generally did not tell his closest friends about its existence, nor allow them to enter the den.

A few days before the decedent died, he gave the combination to his home safe to Polachek and taught her how to open the safe by herself.  Polachek testified that the safe had cash in it at this time but that it had no cash in it when she and Gonzalez opened the safe together following the decedent's death.  Gonzalez was regularly in the decedent's home following his death, including the period of time before she and Polachek opened the safe together.  Gonzalez testified to the effect that she did not know how to open the safe alone, but needed Polachek's assistance to do so.  We find that testimony incredible.  Gonzalez was deeply involved with the decedent and his wealth for approximately 1 year before his death, and we believe it incredible that the decedent would have taught Polachek to open the safe but not Gonzalez.  This is especially

---

[30](...continued)
accounts.  They reported that the balance in the money market accounts was approximately $412,000 and that the balance in one of the checking accounts was $822.  They reported that the other checking account had a $109,760 deficit.

so given the fact that the decedent informed Gonzalez as to the specifics of his extensive holdings.

We find that the decedent when he died had cash of $50,000 at home. The decedent when he died had amassed at his home valuable assets worth hundreds of thousands of dollars, and we believe under the facts and circumstances of this case that it is reasonable to conclude that the decedent also kept at home a significant amount of cash. This is especially so given that the decedent tended to keep his assets secreted at home rather than in banks (e.g., he kept many of his coins hidden in his garage) and that he had a history of giving large sums of cash (not checks) to at least Gonzalez, Polachek, and Wong. He gave $16,000 in cash to Wong in or about 1987. He gave $50,000 in cash to Gonzalez and Polachek in 1991. He gave to Wong in or about 1991 cash of $77,000 and additional money to pay off approximately $250,000 of her debts. We also note that some of the receipts in evidence do not relate to the decedent's checks in evidence, which indicates to us that the decedent on various occasions paid large sums of cash for his purchases of the items which he collected.

### e. Coins

Respondent did not recover all of the coins omitted from the taxable estate. Gonzales understood that the decedent had approximately 500 coins in the possession of Superior

Stamp & Coin (Superior) before the auction of February 25, 1992.

Given the fact that Gonzalez was well informed as to the extent

of the decedent's holdings, we conclude that the decedent near

the time of his death owned 500 coins. Of these coins, 201

(209-8) were sold in the auction and 227 (191 + 36) were reported

on the estate's Federal estate tax return.[31] This leaves 72

coins (500 - (201 + 227)), 41 of which were seized and 31 of

which have not been recovered by respondent. In light of the

tough and thorough litigation with Superior, we believe that

those of the 500 coins in Superior's possession which were not

sold were returned to the decedent.

We find a fair market value of $425,847 for the 31 coins

which were not recovered by respondent. The 201 coins, which

consisted primarily of $1, $2-1/2, and $3 gold coins and certain

pattern gold coins, sold at the first auction for the total

amount of $3,850,622 (an average of $19,157 per coin). The 191

coins, which consisted of $5, $10, and $20 gold pieces and the

Amazonian set, were valued by the Court at $7,635,000 (an average

of $39,974 per coin) as of the applicable valuation date. The 36

---

[31] The decedent consigned to Superior 209 gold proof coins
for auction on Feb. 25, 1992. Of those coins, 201 were sold and
eight were not. The coins reported on the return were those
coins held by Superior when the decedent died. The 191 coins
were at that time consigned to Superior for auction on Oct. 13,
1992. As to the 36 coins, eight of them were the unsold coins
above, and the other 28 were from other consignments made to
Superior before 1991 and for which Superior was awaiting a
written request from the decedent for their return.

coins, which were similar to the 191 coins, were valued by the Court at $494,523 (an average of $13,737 per coin) as of the applicable valuation date. We find the applicable fair market value of the 31 coins using the $13,737 average value (31 x $13,737 = $425,847).[32]

### f. Rugs

By her own admission, Gonzalez removed three rugs from the decedent's home. While the estate asserts that these rugs had little dollar value, we believe that these rugs were worth a lot of money in light of the decedent's wealth, lifestyle, and desire to own (and be seen as owning) only the best of everything. In fact, the value of these assets caused Gonzalez to expend the time, effort, and expense to transport them cross-country from the decedent's home in Southern California to her home in Florida.[33]

The decedent purchased 10 handmade rugs from Lloyds on December 5, 1988. The receipts for that day indicate that the decedent paid $276,000 to Lloyds for all of the items listed therein and that the listed jade urns had been appraised at

---

[32] We recognize that the parties stipulated that the value of the 41 seized gold coins totaled $104,500 (an average of $2,549 per coin). We do not believe that the stipulated value is a proper measure of the value of the 31 coins.

[33] The estate has not established that Gonzalez transported any of these rugs to her home for sentimental reasons. In fact, the record leads us to a contrary conclusion.

$45,000. The parties stipulated that the coexecutors did not report the Isfahan rug on the estate's Federal estate tax return. At trial, the Court granted the estate's request to vacate that stipulation. The estate had pointed to the fact that the Lloyds's receipts in evidence listed 10 rugs and that the coexecutors included in the taxable estate the 10 rugs shown on Butterfield's appraisal. The estate alleged that the Isfahan rug was reported by the coexecutors as the "Indian rug, 55 x 86 inches" with a value of $400. The Court informed the parties that the issue of whether the coexecutors included the applicable fair market value of the Isfahan rug in the taxable estate would be decided on the basis of the record.

On the basis of the record, we conclude that the Isfahan rug was not the referenced Indian rug. Isfahan (or Esfahan as it is more commonly spelled) is a city in Iran. It is not a city in India. We also conclude that the 10 rugs reported on the estate's Federal estate tax return did not represent the total fair market value of the 10 rugs purchased from Lloyds on December 5, 1988. As explained below, we find that the coexecutors failed to include within the taxable estate $59,530 for rugs owned by the decedent when he died.

The December 5, 1988, receipts show that the decedent paid a bulk price of $276,000 for 24 items (the 20 items shown in item numbers 2 through 21 inclusive of five rugs shown in item number

18).[34]  Of those 24 items, 10 are rugs, five are pieces of ivory, three are pieces of jade, one is a 30.02-ct. graduated-diamond necklace, one is a pair of diamond earrings, one is a 7.75 ct. diamond, one is a genuine masterpiece 18.02 ct. sapphire, one is netsukes, and one is two rosewood tables.  We apportion the $276,000 sales price among these items in the following manner.

First, we apportion $45,000 to the three items of jade to reflect their appraised value.  Second, we apportion $18,750 to the five pieces of ivory to reflect what we decide was a reasonable $3,750 per piece value for ivory.  We ascertain that per piece value taking into account the fact that Butterfield appraised two of the decedent's ivory urns at a per piece value of $2,000 and that Carmona testified in the setting of jewelry sales that the fair market value of an item purchased at auction generally equals the auction price plus a 25 to 50 percent dealer-to-retailer markup and a 50 to 100+ percent retailer-to-public markup.  On the basis of the record before us, we consider the sale of jewelry as sufficiently similar to the sale of ivory for purposes of valuing the latter, and we conservatively apply the lower range of the estimated markups.  In other words, we find for purposes of our analysis that the retailer's price for

----

[34] Item 1 in receipt number 565 is the "Turquoise Necklace" and "Wall of IVORY Art piece".  Whereas receipt 565 states that this necklace and wall of ivory were given to the decedent in exchange for netsukes, we do not attribute any of the $276,000 to those two items.

ivory was $2,500 per item ($2,000 + ($2,000 x .25)), and that the retail sales price for ivory was $3,750 per item ($2,500 + ($2,500 x .50)).

Third, we apportion $25,000 to the item of netsukes to reflect the fact that the decedent had on May 4, 1989, paid that amount for other netsukes. Fourth, we apportion $4,416 to the two rosewood tables to reflect our finding supra p. 42 that the Baker's tables were each worth $2,208 and our decision that the Baker's tables are a good measure of the value of the rosewood tables. Fifth, we apportion $66,404 to the diamond necklace, $9,000 to the diamond earrings, $35,800 to the 7.75-ct. diamond, and $9,100 to the 18.02-ct. sapphire to reflect our findings infra pp. 58, 62, 69-70, 73, of those fair market values. Sixth, we apportion the remaining $62,530 of the $276,000 sales price to the 10 rugs.[35] We allow the estate credit for $3,000 of rugs reported on its estate tax return and conclude that $59,530 of

---

[35] To summarize:

| | |
|---|---|
| Three pieces of jade | $45,000 |
| Five pieces of ivory | 18,750 |
| Netsukes | 25,000 |
| Rosewood tables | 4,416 |
| Diamond necklace | 66,404 |
| Diamond earrings | 9,000 |
| Loose diamond | 35,800 |
| Loose sapphire | 9,100 |
| 10 rugs | 62,530 |
| | 276,000 |

value was unreported by the coexecutors primarily for the Isfahan rug, but for other rugs as well.

### g. Jade collection

The Schiffer document lists the value of the decedent's jade collection at $250,000 as of February 21, 1992. Schiffer obtained this value from the decedent. The decedent purchased $45,000 of jade from Lloyds on December 5, 1988. The decedent purchased other items of jade at other times.

The coexecutors reported on the estate's Federal estate tax return that the only jade included in the taxable estate was two jade plaques with a fair market value of $2,500. The reported value equaled the amount on the Butterfield appraisal shown for those items. Taking into account the decedent's own valuation of his jade collection and allowing the estate credit for the reported value of the plaques, we find the fair market value of the remainder of the jade collection at $247,500 as of the applicable valuation date ($250,000 - $2,500).

### h. Ivory collection

On May 4 and December 5, 1988, the decedent purchased from Lloyds numerous items of ivory. The decedent purchased other items of ivory at other times. On December 7, 1992, the estate's accountants prepared a preliminary summary of the estate which listed the value of the decedent's ivory collection at $1.5

million as of March 18, 1992.  Gonzalez believed that the ivory

collection was worth an amount consistent with that valuation.

We decide that the decedent had a significant ivory

collection when he died.  We find consistent with the preliminary

statement and Gonzalez's understanding of the decedent's ivory

holdings that the fair market value of the decedent's ivory

collection was $1.5 million as of the applicable valuation

date.[36]

### i.  Loose Gemstones

### i.  Diamonds

The Schiffer document lists the value of the decedent's

diamond collection at $500,000 as of February 21, 1992.  Schiffer

obtained this value from the decedent.  The decedent estimated

this value conservatively and not as an accurate gauge of the

fair market value of his diamonds.  Respondent seized 13 loose

diamonds from the safe deposit box, and those diamonds were

appraised by Carmona at a fair market value of $1.1 million and

sold at auction for a total price (exclusive of buyer's

commissions) of $764,600.  The seized diamonds, their values as

---

[36] As stated supra note 29, we give little weight to a
letter written by Christie's stating that "most" of the
decedent's Chinese artifacts were of modern or late production.
In addition to the fact that we do not know whether Christie's
examined all of the decedent's ivory collection, or actually
considered ivory to be a Chinese artifact, we note that
Christie's acknowledged in its letter by its use of the word
"most" that some of the Chinese artifacts which it examined were
not of modern or late production.

appraised by Carmona, and their auction prices (exclusive of

buyer's commission) are as follows:

| Carat Weight | Carmona's Appraised Value | Auction Price of Christie's |
|---|---|---|
| 1.9 | $11,800 | $9,600 |
| 2.01 | 15,000 | 7,500 |
| 3.35 | 52,300 | 25,000 |
| 4.03 | 19,600 | 7,500 |
| 4.32 | 97,000 | 105,000 |
| 5.01 | 48,000 | 35,000 |
| 6.62 | 21,500 | 20,000 |
| 6.65 | 22,000 | 24,000 |
| 7.57 | 48,000 | 30,000 |
| 7.74 | 35,800 | 27,000 |
| 11.13 | 59,000 | 44,000 |
| 18.28 | 210,000 | 210,000 |
| 40.02 | 460,000 | 220,000 |
| | 1,100,000 | 764,600 |

The decedent also purchased from Lloyds in 1988 seven loose

diamonds which were not reported on the Federal estate tax return

and which were not included in the 25 seized assets.  Five of

these diamonds were purchased on January 16, 1988, one was

purchased on May 4, 1988, and one was purchased on December 5,

1988.  The five diamonds purchased on January 16, 1988, are an

emerald-cut 2.08-ct. diamond, an emerald-cut 2.28-ct. diamond

with VS1 clarity, a GIA certificate round 3.04-ct. diamond with

VVS2 clarity and I color, a heart-shape-baguette 5-ct. diamond,

and a round-cut 5.22-ct. diamond.  The diamond purchased on

May 4, 1988, was a masterpiece 4.39-ct. diamond with a faint blue

color.  The diamond purchased on December 5, 1988, was a round

7.75-ct. diamond. We find that the decedent retained ownership of these seven diamonds at his death.

We find the fair market value of these seven diamonds through a three-step process. First, we look to the prices at which Mamiye sold similarly weighted diamonds.[37] We consider those arm's-length retail prices to be the best indicia of fair market value on the basis of the record before us. If a diamond sold by Mamiye was similar in weight to one of the seven diamonds in question, we use that comparable diamond to measure the fair market value of the diamond in question.

By its weight, the 5.01-ct. diamond that Mamiye was selling for $75,000, if purchased separately, is comparable to the five-ct. and 5.22-ct. diamonds in question. We decide that the five-ct. diamond was for practical purposes the same weight as the 5.01-ct. diamond sold by Mamiye and observe that the 5.22-ct. diamond was 4.2 percent larger in weight than the 5.01-ct. diamond ((5.22 - 5.01)/5.01 = .042). We find on the basis of the $75,000 price that the fair market values of the five-ct. and 5.22-ct. diamonds were $75,000 and $78,150 ($75,000 + ($75,000 x .042)), respectively, as of the applicable valuation date.

---

[37] We understand that the value of gemstones depends not just on weight but on color, cut, and clarity as well. The record before us generally does not allow us to factor color, cut, or clarity into our valuations as to gemstones which are "comparable" to the gemstones in question.

We do not find in the record that Mamiye sold a diamond that was comparable to one or more of the five remaining diamonds. As to these five diamonds, we turn to Carmona's opinion as set forth in his expert report. If a diamond that was valued by Carmona was similar in weight to one of the five remaining diamonds, we use that comparable diamond to measure the fair market value of the diamond in question, unless the record establishes that Carmona's appraised value was not indicative of the diamond's retail sales price. Under the facts herein, we believe that Carmona's opinion is the second best measure of the fair market value of four of the five remaining diamonds.

Carmona opined that the fair market value of the 2.01-ct. diamond was $15,000. We decide that the 2.01-ct. diamond was the best measure of value for the 2.08 and 2.28-ct. diamonds. On the basis of Carmona's appraisal of the 2.01-ct. diamond at $15,000, and the fact that the 2.01 diamond is 3.4 and 13.4 percent smaller in weight than the 2.08-ct. and 2.28-ct. diamonds, respectively ((2.08 - 2.01)/2.01 = .034; (2.28 - 2.01)/2.28 = .134), we find that the fair market values of the 2.08 and 2.28-ct. diamonds were $15,510 ($15,000 + ($15,000 x .034) and $17,010 ($15,000 + ($15,000 x .134)) respectively.

Carmona opined that the fair market value of the 3.35-ct. diamond was $52,300. We decide that the 3.35-ct. diamond was the best measure of value for the 3.04-ct. diamond. On the basis of

the $52,300 value and the fact that the 3.04-ct. diamond was 9.3 percent smaller than the 3.35-ct. diamond ((3.35 - 3.04)/3.35 = .093), we find that the fair market value of the 3.04-ct. diamond was $47,436 ($52,300 - ($52,300 x .093)).

Carmona opined that the fair market value of the 7.74-ct. diamond was $35,800. We decide that the 7.74-ct. diamond was the best measure of value for the 7.75-ct. diamond. On the basis of the $35,800 value and the fact that the 7.74-ct. diamond was for practical purposes the same weight as the 7.75-ct. diamond, we find that the fair market value of the 7.75-ct. diamond was $35,800.

Lastly, we turn to the auction prices to find the value of the remaining diamond. A faint blue 4.32-ct. diamond sold at auction for $105,000. Whereas the 4.32 ct. diamond actually sold at auction for more than its $97,000 value as appraised by Carmona, we do not consider Carmona's appraised value to be the best measure of value for the faint blue 4.39 ct. diamond.[38] On the basis of the price at which the 4.32 ct. diamond sold at auction and taking into account the fact that the 4.39-ct. diamond was 1.6 percent larger than the 4.32-ct. diamond ((4.39 - 4.32)/4.32 = .016), we decide that the fair market value of the 4.39-ct. diamond was no less than $106,680 ($105,000 +

---

[38] We note that Carmona had stated in his report that his valuations were not under ideal conditions.

($105,000 x .016)) and, indeed, most likely more than that amount.[39]  On the basis of the record, we find the fair market value of the 4.39-ct. diamond at its minimum value of $106,680.

### ii.  Emeralds

The coexecutors did not include any loose emeralds in the taxable estate.  When he died, the decedent owned numerous loose emeralds including at least one that weighed eight carats.  With the exception of the eight-ct. emerald, the record does not establish the carat weight or specifics of any of the other loose emeralds owned by the decedent.

Respondent did not seize any loose emeralds from the safe deposit box, but he did seize two 18-kt. gold, emerald, and diamond necklaces.  One of those necklaces, item 2j in the appendices, had a 6.07-ct. emerald and 270 small diamonds with a total weight of 10.44 carats.  We find supra p. 18 that the applicable fair market value of this necklace was $19,000.  The other seized necklace, item 2i in the appendices, had a 6.48-ct. emerald and 245 small diamonds with a total weight of 32.5 carats.  The parties stipulated that the applicable fair market value of this necklace was $19,000.

---

[39] As noted above, we do not consider the auction prices of Christie's to be a good gauge of the fair market value of the related items; we generally view those prices as significantly less than fair market value.

We decide that the fair market values of the two emerald necklaces is most probative of the fair market value of the eight-ct. emerald. On the basis of the $19,000 value, we find as of the applicable valuation date that the fair market value of the eight-ct. emerald was $16,150. We find the $16,150 fair market value by increasing the $19,000 by 27.5 percent ($19,000 x .275 = $5,225) to reflect the fact that the eight-ct. emerald is 27.5 percent larger than 6.275 ((8 - 6.275)/6.275 = .275), which is the average weight of the emeralds on the necklaces in items 2i and 2j, and then decreasing the total of $24,225 ($19,000 + $5,225) by one-third ($24,225/3 = $8,075) to account for the fact that the $24,445 value included a necklace that was 18-kt. gold and had an assortment of small diamonds ($24,225 - $8,075 = $16,150).

We find a fair market value of $32,300 for other emeralds owned by the decedent when he died. Although the record does not establish the exact number of other loose emeralds owned by the decedent when he died, we surmise from the record that the decedent must have then owned at least two other loose emeralds. We decide conservatively that the decedent owned two other emeralds when he died, that the value of each of those emeralds was the same as the eight-ct. emerald, and that the total fair market value of those two other emeralds was two times the fair market value of the eight-ct. emerald ($16,150 x 2 = $32,300).

### iii. Opals

The coexecutors did not include any loose opals in the taxable estate.  Testimony establishes that the decedent owned "numerous" opals when he died.  Whereas the record does not establish the number or specifics of any of these "numerous" opals, we decide conservatively that the decedent owned two opals when he died.

We believe that it is reasonable on the basis of the facts and circumstances at hand to conclude that the fair market value of each of the decedent's two opals was the same as the fair market value of each of the decedent's emeralds.  We find that the fair market value of the opals totaled $32,300 (2 x $16,150).

### iv. Ruby

Lloyds's receipt number 597, dated May 5, 1988, reported that the decedent purchased an 18-ct. ruby from Lloyds for the price of $7,500.  We find that the decedent retained ownership of this ruby at his death.  On the basis of the price listed on the receipt, we find that the fair market value of the 18-ct. ruby was $7,500 as of the applicable valuation date.

### v. Sapphires

The coexecutors did not include any loose sapphires in the taxable estate.  Respondent seized from the safe deposit box one loose blue sapphire, 18.2 carats in size, which we valued supra p. 18 at $9,100.  That sapphire was not the same sapphire as

either the Ceylon genuine masterpiece 18.02-ct. sapphire shown on the pertinent Lloyds's receipt of December 5, 1988, or the 18-ct. sapphire shown on the Lloyds's receipt of May 5, 1988. We find that the decedent retained ownership of the 18-ct. sapphire and the 18.02-ct. sapphire at his death.

We find that the fair market value of the 18-ct. sapphire was $6,000 as of the applicable valuation date. Lloyds listed that amount on the May 5, 1988, receipt as the price of that sapphire. On the basis of our valuation of the seized 18.2-ct. sapphire and the fact that the 18.2-ct. sapphire was for practical purposes the same weight as the 18.02-ct. sapphire, we find that the fair market value of the 18.02 sapphire was $9,100 as of the applicable valuation date. We attribute the differential between the valuations of $6,000 for the 18-ct. sapphire and $9,100 for each of the 18-ct. and 18.02 ct. sapphires to the fact that the two more expensive sapphires were a "blue" sapphire and a "genuine masterpiece" "Ceylon" sapphire, respectively.

### j. Bracelets

#### i. Diamond

On January 16, 1988, the decedent purchased from Lloyds an 18-kt. gold bracelet with a 9.5-ct. diamond. The receipt for that item reported that its price was $12,400. We find that the decedent retained ownership of this bracelet at his death. On

the basis of the price listed on the receipt, we find that the fair market value of this bracelet was $12,400 as of the applicable valuation date.

The decedent typically purchased diamond bracelets with one-ct. diamonds set all the way around each bracelet. Hesselgesser and his wife saw decedent with "several" bracelets, and Standard saw 8 or 10 diamond tennis bracelets and believed that at least 1 of those bracelets had an assortment of diamonds which were 1 carat each. The decedent gave Wong two diamond tennis bracelets, one with 10.5 carats of diamonds and the other with approximately seven carats of diamonds. The decedent bought one of the bracelets given to Wong at a coin show, and he bought the other bracelet given to Wong from Mamiye. We decide that the taxable estate included seven unreported diamond tennis bracelets (average of nine bracelets seen by Standard less the two bracelets given to Wong), and that one of these seven bracelets had one-ct. diamonds all around it.

For the diamond tennis bracelet with one-ct. diamonds all around it, we find that its fair market value was $108,000 as of the applicable valuation date. The parties stipulated that the tie tack with a one-ct. diamond had an applicable fair market value of $4,500. On the basis of our review of the pictures and descriptions of the items displayed in the auction catalogue of Christie's in evidence (auction catalogue), we decide that this

tennis bracelet was 6 1/2 inches long and contained 24 one-ct. diamonds.  We use the tie tack as a measure of the minimum value for each one-ct. diamond (24 x $4,500 = $108,000).[40]

As to the six other diamond tennis bracelets, we find that their total fair market value was $191,568 as of the applicable valuation date.  Item number 293 in the auction catalogue is a 6 5/8 inch bracelet with 44 rectangular-cut diamonds weighing approximately 17.5 carats in total.  Christie's estimated that the value of this bracelet was $20,000 to $25,000.  We decide on the basis of the record at hand that this bracelet is the best measure of the fair market value of the six diamond tennis bracelets in question.

As to the 11 seized items of jewelry, Christie's had ascertained that their lower and upper estimated values totaled $98,000 ($70,000 of sold items + $28,000 of unsold items) and $147,000 ($107,500 of sold items + $39,500 of unsold items), respectively.  Carmona ascertained that their fair market values totaled $183,400 ($146,200 of sold items + $37,200 of unsold items).  The total value ascertained by Carmona is 24.76 percent greater than the total upper estimated value for these 11 items (($183,400 -$147,000)/$147,000 = .2476)).  Consistent with Carmona's valuation of the 11 items of jewelry vis-a-vis their

---

[40] As discussed <u>supra</u> pp. 20-24, we consider the auction prices, and hence the stipulated values, to be less than fair market value.

total upper estimated values as ascertained by Christie's, we find that the fair market value of each of the six bracelets was $31,190 as of the applicable valuation date; i.e., 24.76 percent greater than the higher estimated value of $25,000 for item number 293 ($25,000 + ($25,000 x .2519) = $31,190). We find accordingly that the fair market values of these six diamond tennis bracelets totaled $187,140 as of the applicable valuation date ($31,190 x 6 = $187,140).

### ii. Ruby/Sapphire

The decedent owned a sapphire bracelet that was part of the set that included the seized sapphire necklace and the seized sapphire ring. The decedent owned a ruby bracelet that was part of the set that included the seized ruby necklace and the seized ruby ring. We find that the decedent retained ownership of these bracelets at his death.

We decide that the fair market value of each of these bracelets was the same as the fair market value of the matching necklace.[41] Thus, we find that the fair market value of the sapphire bracelet was $4,400 as of the applicable valuation date; i.e., the same fair market value that we find for the sapphire necklace listed as item 2d in the appendices. We find that the fair market value of the ruby bracelet was $5,800 as of the

---

[41] We decide that a bracelet is more similar in size to a necklace than to a ring.

applicable valuation date; i.e., the same fair market value that we find for the ruby necklace listed as item 2e in the appendices.

k.  Necklaces

Respondent seized seven necklaces from the safe deposit box. The receipts from Lloyds establish that the decedent purchased six other necklaces which were not seized by respondent.  The May 4, 1988, receipt indicates that the decedent purchased on that date a diamond necklace, a sapphire necklace, and a ruby necklace.  Testimony establishes that the diamonds on the diamond necklace were all the same size and were set in yellow gold.  The May 5, 1988, receipt indicates that the decedent purchased on that date a necklace with a 26.73-ct. diamond.  The December 5, 1988, receipt indicates that the decedent purchased on that date an 11-millimeter-wide, 30-inch-long turquoise necklace and a necklace with graduated diamonds weighing 30.02 carats. Testimony establishes that the diamonds on the graduated necklace sloped down in size to one carat on the front stones and were set in white gold with yellow gold on the bottom.  We find that the decedent retained ownership of these six unseized necklaces at his death.

i.  Diamond Necklaces of May 4, 1988

As to the three necklaces purchased on May 4, 1988, the May 4, 1988, receipt shows that the decedent paid a bulk price of

$235,000 for 26 items. Included in those items are ivory, a diamond necklace, a sapphire necklace, a ruby necklace, a ruby ring, a sapphire ring, and a faint blue masterpiece 4.39-ct. diamond. We apportion the $235,000 sales price among these categories in the following manner.

First, we apportion $75,000 to the ivory. Exclusive of the ivory, the May 4, 1988, receipt lists six items. We conclude that the remaining 20 items referenced in the receipt were pieces of ivory that are included within the ivory shown on the receipt in the categories "erotic giga", "Wise mens", "Erotic", or "40 tall 3 figure". On the basis of our decision supra pp. 51-52 that $3,750 was a reasonable amount to attribute to each piece of ivory, we conclude that the fair market value of the ivory referenced in this receipt totals $75,000 (20 x $3,750). Second, we apportion $106,680 to the 4.39-ct. diamond to reflect our valuation of that diamond supra pp. 58-59. Third, we decide that the balance of $53,320 ($235,000 - ($75,000 + $106,680)) was attributable to the remaining three necklaces and two rings. We apportion the $53,320 to those items using a weighing process under which we decide (following, in part, our examination and comparison of the appraised values of the necklaces and rings shown in appendix A) that each of the necklaces was worth the same amount and that each of the rings was worth 1/2 of the value

of a necklace.[42]  As we did similarly above, we assign a weight
of two to each of the three necklaces and a weight of one to each
of the two rings.  In that the sum of these weights totals eight
(2 + 2 + 2 + 1 + 1 = 8), we apportion 2/8 of $53,320 to each of
the three necklaces (2/8 x $53,320 = $13,330) and 1/8 of $53,320
to each of the two rings (1/8 x $53,320 = $6,665).[43]  We find
accordingly that the fair market value of each of the three
necklaces shown on the May 4, 1988, receipt was $13,330 as of the
applicable valuation date.

### ii.  Diamond Necklaces of May 5, 1988

On May 5, 1988, the decedent purchased from Lloyds an 18-kt.
gold necklace with a 26.73-ct. diamond.  The receipt for that
item reported that its price was $74,000.  We find that the fair
market value of this necklace was the same as of the applicable
valuation date.

---

[42] The May 4, 1988, receipt states no specific information
on these necklaces and rings, but for the gemstones.

[43]  To summarize:

| | |
|---|---:|
| Ivory | $75,000 |
| 4.39-ct. diamond | 106,680 |
| Diamond necklace | 13,330 |
| Sapphire necklace | 13,330 |
| Ruby necklace | 13,330 |
| Ruby ring | 6,665 |
| Sapphire ring | 6,665 |
| | 235,000 |

### iii. Turquoise and Diamond Necklaces of December 5, 1988

We find that the fair market value of the turquoise necklace was $21,250 as of the applicable valuation date. Lloyds gave the turquoise necklace and a wall of ivory art piece to the decedent in exchange for netsukes. The May 4, 1989, Lloyds's receipt reports that the decedent on that date bought from Lloyds other netsukes worth $25,000,[44] and we find supra p. 52 that the decedent also paid $25,000 for still other netsukes on December 5, 1988. We decide on the basis of these receipts that the value of the exchanged netsukes referenced as item one on the December 5, 1988, receipt also was $25,000. Having decided above that the value of each ivory item was $3,750, we apportion the $21,250 difference between $25,000 and $3,750 to the turquoise necklace.

As to the necklace with graduated diamonds weighing 30.02 carats, we find that the fair market value of this necklace was $66,404 as of the applicable valuation date. On the basis of our review of the pictures and descriptions of items displayed in the auction catalogue, we decide that item numbers 295 and 299 shown therein were proper measures of the fair market value of the graduated-diamond necklace in question. Item number 295 was a 16 3/4-inch platinum necklace set with 55 graduated heart-shape

---

[44] Whereas this receipt lists the only purchased item as "Nestkies", we understand this description to refer to netsukes.

diamonds with a total weight of approximately 60.5 carats. Christie's estimated that this necklace would sell at auction for $120,000 to $150,000. Item number 299 was a 16-inch platinum necklace set with 80 graduated oval-cut diamonds with a total weight of approximately 48 carats. Christie's estimated that this necklace would sell at auction for $70,000 to $90,000. We valued the six seized assets which did not sell at auction at the values as appraised by Carmona. Carmona's total appraised value for the five items of jewelry which did not sell at auction was approximately the same as the total of the upper estimated values for those items as ascertained by Christie's. We decide in the case of the graduated-diamond necklace in question that its applicable fair market value equals the average of the estimated highest values of item numbers 295 and 299, as adjusted to reflect the fact that the graduated-diamond necklace in question had only 30.02 carats of diamonds. In other words, we average the two highest estimated values (($150,000 + $90,000)/2 = $120,000), divide the average value by the average carat weight of item numbers 295 and 299 ((60.5 + 48)/2 = 54.25; $120,000/54.25 = $2,211.9816), and multiply the resulting amount by 30.02 ($2,211.9816 x 30.02 = $66,404).

l.  Rings

i.  Man's Diamond Pinkie Ring

The decedent wore a "pinkie ring" with a noticeable diamond in it.  We find that the decedent retained ownership of this pinkie ring at his death.  The receipts from Lloyds and Mamiye do not list any diamond that was purchased by the decedent that was less than one carat.  We decide that the decedent's pinkie ring had a diamond weighing at least one carat and value that ring as if it had a one-ct. diamond in it.  Consistent with our valuation of the one-ct. diamonds in the decedent's diamond tennis bracelet that we valued supra pp. 63-64 at $108,000, we decide that the one-ct. diamond in the pinkie ring had an applicable fair market value of $4,500.  We find that the fair market value of the decedent's pinkie ring was $4,500 as of the applicable valuation date.

ii.  Other High Quality Man's Diamond Ring

The decedent owned a man's ring with a high quality three- to four-ct. diamond in it.  We find that the decedent retained ownership of this ring at his death.  On the basis of the average of the range of the size of the diamond (i.e., we view the diamond as weighing 3.5 carats), and the fact that a 3.5-ct. diamond weighs 250 percent more than a 1-ct. diamond ((3.5 - 1)/1 = 2.5), we find that the fair market value of the decedent's three- to four-ct. diamond ring was 250 percent more than the

value of the 1-ct. pinkie ring.  In other words, we find that the fair market value of the decedent's three- to four-ct. diamond ring was $15,750 as of the applicable valuation date ($4,500 + ($4,500 x 2.5) = $15,750).

### iii.  Ruby Ring

As discussed above, the May 4, 1988, receipt from Lloyds shows that the decedent purchased a ruby ring as one of 26 items purchased for a bulk price of $235,000.  We find that the decedent retained ownership of this ruby ring at his death.  On the basis of our finding supra p. 68 that $6,665 of that price was attributable to the ruby ring, we find that the fair market value of that ring was $6,665 as of the applicable valuation date.

### iv.  Sapphire Ring

As discussed above, the May 4, 1988, receipt from Lloyds shows that the decedent purchased a sapphire ring as one of 26 items purchased for a bulk price of $235,000.  We find that the decedent retained ownership of this ring at his death.  On the basis of our finding supra p. 68 that $6,665 of that price was attributable to the sapphire ring, we find that the fair market value of that ring was $6,665 as of the applicable valuation date.

m. Earrings

Respondent did not seize any earrings from the safe deposit box. The December 5, 1988, receipt from Lloyds shows that the decedent had purchased on that day a pair of diamond stud earrings. We find that the decedent retained ownership of these earrings at his death.

Consistent with our valuation of the decedent's pinkie ring, we decide that each of the earrings had a one-ct. diamond and that each of these diamonds had an applicable fair market value of $4,500. We find that the fair market value of the earrings was $9,000 as of the applicable valuation date.

n. Tie Tack

In addition to the 1-ct. diamond tie tack that was seized by respondent from the safe deposit box, the decedent owned a tie tack with a three to four-ct. diamond. We find that the decedent retained ownership of this tie tack at his death. On the basis of our finding that the decedent's man's ring with a three to four-ct. diamond had a fair market value of $15,750 as of the applicable valuation date, we find that this tie tack, which had a similar size diamond, had a fair market value of $15,750 as of the applicable valuation date.

o. Pins

The decedent owned a sapphire pin that matched the sapphire bracelet valued above and the seized items consisting of the

sapphire necklace and the sapphire ring.  The decedent owned a ruby pin that matched the ruby bracelet valued above and the seized items consisting of the ruby necklace and the ruby ring. We find that the decedent retained ownership of these pins at his death.

We decide that the fair market values of these sapphire and ruby pins were the same as the fair market values of the sapphire bracelet and the ruby bracelet, respectively.[45]  We find supra p. 65 that the fair market value of the sapphire bracelet was $4,400 as of the applicable valuation date.  We find supra pp. 65-66 that the fair market value of the ruby bracelet was $5,800 as of the applicable valuation date.  Accordingly, we find that the fair market values of the sapphire and ruby pins were $4,400 and $5,800, respectively, as of the applicable valuation date.

p.  Pendants

The May 5, 1988, receipt from Lloyds shows that the decedent purchased six items from Lloyds at a cost of $235,000.  Two of these items were a sapphire pendant with round diamonds and an 18-kt. gold, ruby, and diamond pendant.  The receipt indicates that the prices of those pendants were $15,000 and $18,400,

---

[45] We decide that the pins are more similar in size to the bracelets than to the rings.

respectively.[46]  We find that the decedent retained ownership of these pendants at his death.

We find that the fair market values of the sapphire and diamond pendant, on the one hand, and the 18 kt. gold, ruby, and diamond pendant, on the other hand, were $15,000 and $18,400, respectively, as of the applicable valuation date.

### q.  Furniture

The coexecutors valued the decedent's dining room set at $1,100 ($800 + $300).  We value it supra pp. 41-42 at $17,662.  They valued his curio cabinets at $1,500.  We value these cabinets supra pp. 41-42 at $8,831.  They valued his Ming chair at $50.  We value it supra pp. 41-42 at $2,208.  The sum of these three items as valued by us, on the one hand, and by the coexecutors, on the other hand, is $28,701 ($17,662 + $8,831 + $2,208) and $2,650 ($1,100 + $1,500 + $50), respectively.  We find as to these items that the coexecutors failed to report value of $26,051 ($28,701 - $2,650).

---

[46] Of the items listed on the May 5, 1988, receipt, the only item that did not have a listed price was the "Ivory Maiden". The listed prices of the other items on that receipt totaled $120,900 ($7,500 + $6,000 + $74,000 + $15,000 + $18,400 = $120,900).  We decide that the difference between $235,000 and $120,900 ($114,100) was paid for the ivory maiden.  We decide in this regard that the ivory maiden was either significantly more valuable than the other pieces of ivory which we valued at $3,750 apiece or that it was not one piece of ivory but was a multipiece collection.

II.  Present Value Formulae and Discount Rate of Four Percent

A.  Overview

In Trompeter I, we decided the applicable fair market value of the series A preferred stock includable in the taxable estate. We detailed our valuation methodology but did not identify with specificity the present value formulae which were a part thereof. Nor did we state with specificity the reasons behind our use of a 4-percent discount rate.  The Court of Appeals for the Ninth Circuit remanded this case to us to specify that formulae and to document the reasons for using the 4-percent rate.

B.  Present Value Formulae

1.  Redemption Value of Series A Preferred Stock

The certificate of designation underlying the series A preferred stock (certificate of designation)[47] required that Sterling redeem 1,000 shares of that stock on each December 31, 1993 through 1995.  For each of those dates, we calculated in Trompeter I the amount of the redemption payment payable under the certificate of designation for the decedent's series A preferred stock using the following formula:  $P \times (1 + i/n)^y$. In this context, "P" equals the 511.161 shares of the decedent's series A preferred stock required to be redeemed on December 31,

---

[47] In Trompeter I, we referred to the certificate of designation as a "purchase agreement".  In that we now broaden our findings of fact to address the specific attributes of that stock, and not simply to address the fact that the stock was redeemed, we herein refer to that document by its given title.

1993, 1994, or 1995, multiplied by the liquidation value of each redeemed share at the beginning of the applicable year; "i" equals the annual dividend rate; "n" equals the total number of days in the year; and "y" equals the number of days in a year over which dividends were compounded.[48]  Preferential dividends accrued daily on each share of series A preferred stock at the annual rate of 8.5 percent during 1989, 9.83 percent during 1990, 11.17 percent during 1991, and 12.5 percent during 1992 and at all times thereafter until the share was either redeemed or exchanged.[49]  Our methodology in Trompeter I reflected our finding that holders of series A preferred stock were entitled to receive dividends not simply at an annual rate of 8.5-, 9.83-, 11.17-, or 12.5-percent, but at those rates as adjusted to reflect daily compounding.

Upon remand, we have redetermined that dividends were payable at the annual rates without compounding.  In other words, the amount of dividends payable on a share of series A preferred stock was ascertained for each year simply by multiplying the

---

[48] In other words, we used the basic formula for computing future value in the case of interest that is compounded annually, see generally Thorndike's Compound Interest and Annuity Tables 7 (1982), and adjusted that formula to reflect our finding in Trompeter I that the preferential dividends payable on the series A preferred stock compounded daily.

[49] Holders of series A preferred stock were entitled, subject to minimal restrictions, to exchange their series A preferred stock for Sterling's series B subordinated debentures due Dec. 31, 1995.  See appendix C.

applicable dividend rate by that share's liquidation value.[50]  As

of each December 31, the liquidation value of a share of series A

preferred stock equaled its face value ($1,000) plus all

preferential dividends that had not been paid as of the most

recent January 15.  Thus, assuming as we did in Trompeter I that

the series A preferred stock was issued on March 15, 1989, the

liquidation values of each share of that stock on Dec. 31, 1989,

1990, 1991, 1992, 1993, 1994, and 1995 (assuming that the share

had not been redeemed, exchanged, or had dividends paid with

respect thereto) were $1,000, $1,071.8068, $1,170.9871,

$1,302.4101, $1,512.0629, $1,701.0708, and $1,913.7047,

respectively.  The following accrued dividends which were not

included in the liquidation value were also payable on each of

those shares as of those respective dates:  $67.7671, $94.2603,

$125.424, $156.1291, $181.2404, $203.8955, and $229.3824.  Thus,

as of December 31, 1993, 1994, and 1995, respectively, the

---

[50] The certificate of designation provides that "dividends
on each share of the Series A Preferred Stock * * * will accrue
on a daily basis at the rates per annum computed with respect to
the Redemption Price thereof" and that Sterling "will be
obligated on the Redemption Date to pay to the holder * * * [of
each share to be redeemed] an amount in immediate available funds
equal to the Liquidation Value thereof (the "Redemption Price")."
The certificate of designation also provides that "all dividends
which have accrued on each Share outstanding during the
twelve-month period * * * ending upon each * * * [Jan. 15] will
be added to the Liquidation Value of such Share and will remain a
part thereof until such dividends are paid."

redemption payments payable under the certificate of designation for the decedent's series A preferred stock were as follows:

($1,512.0629 + $181.2404) x 511.161 =   $865,550.60

($1,701.0708 + $203.8955) x 511.161 =   $973,744.47

($1,913.7047 + $229.3824) x 511.161 = $1,095,462.50

### 2.  Discounted Amounts

In Trompeter I, we used the following formula to discount each of the redemption payments as of the applicable valuation date:  $P \times (1 + i/n)^{-y}$.  In this context, "P" equals the value of the series A preferred stock at the time of redemption (i.e., its liquidation value plus any unpaid accrued dividends not included in the liquidation value); "i" equals the discount rate; "n" equals the total number of days in the year; and "y" equals the total number of days over which the discount is compounded.  In other words, we used in Trompeter I the basic formula for computing present value in the case of interest that is compounded annually, see generally Thorndike's Compound Interest and Annuity Tables 19 (1982), as adjusted to reflect our belief that the discount rate should be compounded daily consistent with our determination of the redemption payments.  Now, consistent with our redetermination that the payment of dividends is compounded annually rather than daily, we modify our discount formula by deleting the "n" and using "y" to refer to a fraction

the numerator of which is the total number of days over which the discount is compounded and the denominator of which is 365.

C.  4 Percent Discount Rate

In Trompeter I, we applied in our methodology a 4-percent discount rate to ascertain the discounted value on September 18, 1992, of each of the redemption payments which Sterling was obligated to pay as of the three referenced dates after September 18, 1992.  The Court of Appeals for the Ninth Circuit questioned whether a 4-percent discount rate accurately reflects the risk that Sterling would not have redeemed its series A preferred stock as required by the certificate of designation.  According to the Court of Appeals for the Ninth Circuit: "it seems a bit of a stretch to conclude that a buyer would have accepted a discount rate of only four percent to account for the time value of money and the risk that Sterling would not meet its contractual obligations."  Estate of Trompeter v. Commissioner, 279 F.3d 767, 773 (9th Cir. 2002) (emphasis added), vacating and remanding T.C. Memo. 1998-35, supplemented by 111 T.C. 57 (1998).

Our 4-percent discount rate did not reflect the risk that Sterling would fail to meet its contractual obligations but reflected only the time value of money; i.e., the fact that one dollar to be received in the future is not worth one dollar today.  We believe that a 4-percent rate is a reasonable indicator of the time value of money as of the applicable

valuation date. The T-bill rate was 2.954 for the week of September 14, 1992, and it was 2.9740 for the week of September 21, 1992. The annualized inflation rate was 2.99 percent for September 1992.

As to the risk that Sterling would not meet its contractual obligation to redeem its series A preferred stock, we believe that a hypothetical buyer would have demanded minimal additional compensation to accept such a risk under the facts herein. Pursuant to the certificate of designation, the hypothetical buyer was already entitled to compensation for that risk in that, in the event of a default, dividends would continue to accrue daily at the annual rate of 12.5 percent on any share of series A preferred stock that was not redeemed. The hypothetical buyer also was deemed to know on the applicable valuation date that Sterling and its subsidiaries, with the consent of their creditors, had recently restructured certain of their debt and had issued additional equity so as not to default on debt and so that Sterling could redeem some of its other shares of stock.[51] Specifically, on June 29, 1989, Sterling replaced $1.5 million of

---

[51] Sterling's consolidated group included itself and its wholly owned subsidiaries Trompeter Electronics, Inc. (TEI), Quality Components, Inc. (QCI), and TQ Management Company (TQM). TEI, QCI, and Sterling were incorporated on Nov. 22, 1988, to facilitate the March 1989 leveraged transaction described in Trompeter I. TQM was formed on Apr. 25, 1989, to perform managerial services for Sterling in relation to the operations of TEI and QCI.

senior subordinated notes with $2,450,000 of senior subordinated notes, TEI and QCI replaced $9 million of subordinated notes with $9 million of subordinated notes, and Sterling issued $181,452 of 1-year promissory notes. Sterling also on that date had issued 840,055 shares of class A common stock and 1,209,945 shares of class B common stock for an aggregate amount of $200,000 and had redeemed 550 shares of series S convertible preferred stock (series S preferred stock) and 1,500 shares of series T convertible preferred stock (series T preferred stock) at stated liquidation values totaling $102,500. We believe that a hypothetical buyer would have concluded on the applicable valuation date that Sterling was mindful of its contractual obligations both as to debt and as to equity and that Sterling would go to great lengths not to breach its contractual obligations, including its obligation to redeem its series A preferred stock timely.

The decedent's shares of series A preferred stock also were part of Sterling's senior class of stock. Sterling had issued 3,000 shares of that stock to the decedent and his former wife in March 1989 in acquisition of TEI. The 3,000 shares were the only shares of series A preferred stock issued by Sterling, and holders of those share were generally entitled to more rights than holders of Sterling's other stock. As of the applicable valuation date, Sterling's other outstanding preferred shares

consisted of 25,000 shares of series C exchangeable preferred stock, 5,450 shares of series S preferred stock, and 1,000 shares of series T preferred stock. Each share of these other classes of preferred stock accrued dividends whether or not declared, but holders of those shares (as well as holders of Sterling common shares) were generally precluded from receiving dividends or distributions as to their shares before the vested rights of the holders of series A preferred stock were satisfied in full. Accordingly, after the dates of the scheduled redemptions for the series A preferred stock, Sterling would need first to honor its redemption obligation before it could satisfy the requirements of its other shareholders.

Although Sterling was prohibited by its senior debt and senior subsidiary debt agreements from redeeming any of its stock or paying any dividends on its stock in certain circumstances, we do not believe that a hypothetical buyer would have considered these agreements to have prevented Sterling from redeeming its series A preferred stock timely. In appendix C, we list on a consolidated basis Sterling's debt as of December 31, 1989 through 1992. The relevant provisions underlying this debt generally tied a redemption to Sterling's profitability. As of the applicable valuation date, Sterling was a viable entity that had a positive cashflow for that and the previous 2 years. Although it had reported losses for 1991 and 1992, those losses

were attributable primarily to its amortization of intangible assets and deferred financing costs (the 1992 loss also was attributable to a one-time writeoff of $2,953,646), and it had reported significant net income for 1992.  It also was timely paying interest and principal on its senior debt, and it had recently restructured its debt and equity as discussed supra pp. 81-82 so as not to default on debt and to redeem other preferred shares.

In addition to the risk that Sterling would not redeem its series A preferred stock timely, however, is the risk that Sterling would not redeem its series A preferred stock for the contractual amount referenced in the certificate of designation but would redeem those shares at a lesser amount.[52]  We did not take this risk into account in Trompeter I.  Upon remand, we now believe that our 4-percent discount rate undercompensated the hypothetical buyer for this risk.  In lieu of the 4-percent discount rate that we applied in Trompeter I, we now believe on the basis of the record before us that the more appropriate rate is an annual rate of 12.5 percent.  This 12.5-percent rate is

---

[52] We note but do not rely upon the fact that Sterling eventually did such a thing when, after the applicable valuation date, it agreed to redeem its series A preferred stock at approximately $1,270.21 per share ($1,947,845 redemption price paid to the Trust/1,533.482 redeemed shares).  We also note but do not rely upon the fact that this lesser amount reflected the payment of 5 percent interest in lieu of the accrued dividends which were payable under the certificate of designation.

approximately three times the 4-percent rate that we believe reflects the time value of money and, as discussed above, is the same rate at which a holder of series A preferred stock would be compensated following an untimely redemption.  A 12.5-percent rate also approximates the rate that as of the applicable valuation date was payable on the series B subordinated debentures, the debt into which the series A preferred stock was convertible, and is 5 percentage points greater than the rate that was payable on the senior term notes as of December 31, 1992.[53]

The estate asserts on remand that we should determine the fair market value of the series A preferred stock by applying a 20-percent discount rate to the $1,947,845 actually paid to redeem the decedent's shares.  We disagree.  In addition to the fact that the estate's proffered rate does not take into account our finding that a holder of series A preferred stock would following a missed redemption be entitled to daily dividends at a 12.5-percent annual rate, the estate's rate ignores the solid history of Sterling in honoring its contractual obligations.  We also are unpersuaded by the record before us that a rate approximately seven times the referenced T-bill and inflation rates is appropriate in this case, let alone that we should apply

[53] We recognize that Dec. 31, 1992, postdates the applicable valuation date.  We believe that a hypothetical buyer on the applicable valuation date could have ascertained this rate.

the discount rate to the amount actually paid for the stock after the applicable valuation date.

Nor do we agree with the estate's assertion on remand that we should discount our redetermined value to take into account a lack of marketability for the series A preferred stock. The estate relies upon its expert, Herbert T. Spiro (Spiro), who testified in Trompeter I that the freely traded value of the decedent's series A preferred stock should be adjusted for lack of marketability. The estate's reliance on this testimony is misplaced. Spiro opined that the "freely traded value" of the decedent's shares should be discounted for lack of marketability, and our methodology does not determine the freely traded value of those shares. Where as here the value determined for shares of stock is not the freely traded value of those shares, a lack of marketability discount is inappropriate. As we noted in Estate of Cloutier v. Commissioner, T.C. Memo. 1996-49, in rejecting a similar assertion, a marketability discount generally represents the additional price that an unlisted share would command if it were freely traded. We held in Estate of Cloutier that a marketability discount did not apply to the stipulated value of the company in question because that value was not representative of the company's freely traded value. Id.

We use our modified formula with the 12.5-percent discount rate to calculate the discounted values of the December 31, 1993, 1994, and 1995, payments as follows:

$$\$865,550.60 \times (1 + .125)^{-470/365} = \$743,746.32$$

$$\$973,744.47 \times (1 + .125)^{-835/365} = \$743,746.36$$

$$\$1,095,462.50 \times (1 + .125)^{-1200/365} = \$743,746.53$$

We conclude that the sum of these discounted values, $2,231,239.21, is the applicable fair market value of the decedent's series A preferred stock.[54]

III.  Determination of Fraud in Trompeter I

Pursuant to the direction of the Court of Appeals for the Ninth Circuit, we have set forth in detail our findings as to the omitted assets.  Our ultimate finding that the value of these assets totals $4.5 million is the same as in Trompeter I.  We also have clarified our reasoning as to the valuation methodology that we applied in Trompeter I.  We continue to adhere to that methodology.  Although we have now slightly modified it to compound the dividends annually, rather than daily, and to recognize the need for an increase in the discount rate to an amount greater than 4 percent, neither of these modifications changes the decision that we entered on March 18, 1999.

---

[54] For completeness, we note that a discount rate of 19.45 percent would under our methodology result in a fair market value approximately equal to the fair market value of $1,947,845 determined by respondent.

Pursuant to the direction of the Court of Appeals for the Ninth Circuit, we now consider whether it is appropriate to revisit our conclusions as to fraud.  We do not believe it is. Although the Court of Appeals for the Ninth Circuit has not asked us to restate the legal basis for our finding of fraud, and thus we do not, we emphasize our belief that the coexecutors' willing and conscious failure to disclose to respondent the assets of the estate, coupled with their deliberate undervaluation of some of the assets which were disclosed to respondent, constitutes clear and convincing evidence of fraud deserving of the section 6663 penalty.

<u>Decision will be entered as previously entered on Mar. 18, 1999</u>.

APPENDIX A

| Description of Jewelry | Appraised Value | Auction Price |
|---|---|---|
| 2a.  Lady's 18 kt. yellow gold, sapphire and diamond ring:  The ring weighs 7.7 grams and has 27 2.5 to 3 mm. square cut natural sapphires, total weight (TW) approx. 3.1 ct., medium-dark slightly grayish-blue, flawless to the unaided eye, and 18 2 mm. square cut diamonds, TW apx. .7 ct., "F-G" color range, "VS" clarity range, good cuts. The sapphires are invisibly set in three rows across the center of the ring with one row of channel set diamonds on each edge. | $1,500 | $1,800 |
| 2b.  Woman's 18 kt. yellow gold, ruby, and diamond ring (same mounting as in 2a, but with rubies instead of sapphires):  The ring weighs 7.6 grams and has 27 2.5 to 3 mm. square cut natural rubies, TW  apx. 3.1 ct., medium red, lightly included to the unaided eye, and 18 2 mm. square cut diamonds, TW apx. .70 ct., F-G/VS (avg.), good cuts.  The rubies are invisibly set in three rows across the center of the ring with one row of channel set diamonds on each edge. | 1,800 | 1,800 |
| 2c.  Man's 14 kt. yellow gold and diamond ring:  The geometric ribbed design ring weighs 13.1 grams and has (set in 4 posts in the center) one round brilliant cut (RBC) diamond, apx. 3.6 ct. (apx. 10 x 5.8 mm.), "E-F-G" color range, "VS" clarity range (based on a cluster of included crystals in the center of the table), depth apx. 58%, table apx. 66%, good symmetry and polish.  Channel set on each side of the center are 4 full cut round diamonds (total of 8), apx. .06 to .07 ct. each, TW apx. .50ct., G-H/SI-I1 (avg.), good cuts. | 37,500 | 20,000 |

2d.  Woman's 18 kt. yellow gold, sapphire, and diamond necklace:  The panther link chain with inverted leaf center is 16" long by 6.3 mm. wide and weighs 44.8 grams, clasp stamped 18K PATPEND milor", back of leaf stamped 18kt".  The leaf has 100 square and custom cut natural sapphires (62 are apx. 2.5 mm. square), TW apx. 10.0 ct., medium-dark slightly grayish-blue, flawless to the unaided eye, and 65 full cut round (FC) diamonds, TW apx. 1.5 ct., F-G/VS (avg.).  The sapphires are invisibly set in the center with a border of channel set diamonds and a stem of bead set diamonds.                4,400      ---

2e.  Woman's 18 kt. yellow gold, ruby, and diamond necklace:  The panther link chain with inverted leaf center is 16" long by 6.3mm. wide and weighs 42.5 grams, clasp stamped "18KTPATPEND milor". The leaf has 141 square and custom cut natural Rubies (118 are apx. 2.5 mm. square), TW apx. 15.5 ct., medium slightly purplish-red, lightly included to the unaided eye, and 18 square cut diamonds, TW apx. .72 ct., F-G/VS (avg.). The rubies are invisibly set with a central stem of channel set diamonds.      5,800      ---

2f.  One 14 kt. yellow gold and diamond tie tack:  The 6-prong mounting weighs .9 grams and has one RBC diamond, apx. 1.02 ct., E-F-G/VS, good symmetry and polish.                              5,400      4,500

2g.  One cultured pearl necklace with 14 kt. white gold clasp:  The 24" uniform strand has 75 7 to 7.5 mm. round cultured pearls, cream white color, low luster, slightly blemished, with a fishhook clasp.                          400       ---

2h.  Woman's 18 kt. yellow gold and diamond necklace:  The drop necklace is 18" long, weighs 93.6 grams, is stamped "18kt" with a <small "D" inside a large "L"> hallmark, and has one pear shape brilliant cut diamond, apx. 8.69 ct. (19.5 x 12.5 x 7.2 mm.), light brown color, "I-1" clarity (feather on lower left), 61 baguette diamonds, TW apx. 4.75 ct., F-G-H/VS-SI (avg.), good cuts, and 440 FC diamonds, TW apx. 13.02 ct. F-G-H/VS-SI (avg.), good cuts.  The pear shape diamond is bezel set in the drop and surrounded by channel set baguette and bead set round diamonds.  The necklace portion also has channel set baguette and bead set round diamonds.          44,000      32,000

2i.  Woman's 18 kt. yellow gold, emerald and diamond necklace:  The necklace is 16-1/2" long, weighs 93.6 grams, is stamped "18k" with the "LD" hallmark, and has one emerald cut natural emerald, apx. 6.48 ct. (13.7 x 9.8 x 6.8 mm.), medium slightly bluish-green, moderately included, and 245 baguette cut diamonds, apx. .08 to .25 ct. each, TW apx. 32.50 ct., F-G-H/VVS-VS (avg.), good cuts.  The  emerald is 4-prong set in the center with pairs and single diamonds prong set in fringe style links.          56,000      19,000

2j.  Woman's 18 kt. yellow gold, emerald, and diamond necklace:  The necklace is 17" long, weighs 97.5 grams, is stamped "18ktK" with the "LD" hallmark, and has one heart shape natural emerald, apx. 6.07 ct. (13.5 x 12.5 x 6.4 mm.), medium slightly bluish-green, moderately included, 176 diamonds, TW apx. 5.22 ct., and 94 baguette cut diamonds, TW apx. 5.22 ct., F-G-H/VVS-VS (avg.), good cuts.  The  emerald is bezel set in the center and surrounded by channel set baguette diamonds and bead set round diamond.          19,000        ---

2k.  Woman's 18 kt. yellow and white gold, opal, and diamond pin/pendant combination with treated opal necklace: The necklace is 23" long with 42 - 10.3 mm. round very dark brown color opal beads and six 11 to 11.5 mm. round white opal beads with faint play of color.  The dark beads have been treated by an impregnation process to give them the appearance of black opals.  The drop has a leafy design yellow gold frame around a center removable white gold frame with one oval cabochon cut natural semi-black opal with moderate green/blue pay-of-color, apx. 30 ct. (38 x 26 x 5.5 mm.), 20 marquise cut diamonds, TW apx. 1.8 ct., H-M/VS (avg.), and 28 baguette cut diamonds, TW apx. 1.1 ct., H-I-J/VS (avg.).  The opal is multi-prong set in the center and surrounded by prong set diamonds.                                     <u>7,600</u>      <u>---</u>

Total for 11 jewelry items          183,400     79,100

## Description of Loose Gemstones

3a.  One loose octagon cut diamond: The diamond weighs apx. 40.02 ct and measures apx. 21.3 x 17.7 x 11.85 mm., fair to good symmetry and polish.  The diamond was subsequently graded on GIA report #8812646 as fancy yellow natural color, VS2 clarity.          460,000    220,000

3b.  One loose round brilliant cut diamond:  The diamond weighs apx. 2.01 ct. and measure apx. 7.98-8.1 x 5.02 mm., good symmetry and polish.  The diamond is accompanied by a note of "I/IF" color/clarity and a notation of "GIA #517260".  The stone appears to match this grading.              15,000      7,500

3c.   One loose round brilliant cut diamond:  The diamond weighs apx. 1.9 ct. and measures apx. 7.72-7.81 x 5.01 mm., good symmetry and polish.  The diamond is accompanied by a note of "E/VS2" color/clarity and a notation of "GIA #5172800".  The stone appears to match this grading.                                          11,800      9,600

3d.   One loose octagon shape diamond:  The diamond weighs apx. 5.01 ct. and measures apx. 9.6 x 8.61 x 6.22 mm., good symmetry and polish.  The diamond is accompanied by an altered note of "Intense Yellow/VS-2" and a notation of "GIA #5234002".  The diamond was subsequently graded on GIA report #8812648 as fancy yellow natural color, VS2 clarity.                                       48,000     35,000

3e.   One loose emerald cut diamond: The diamond weighs apx. 7.57 ct and measures apx. 13.12 x 9.46 x 6.65 mm., good symmetry and polish.  The diamond has a note of "VVS-J(?)", but appears to have a color grade in the range of "J-K" and in the clarity range of "VS".             48,000     30,000

3f.   One loose round brilliant cut diamond:  The diamond weighs apx. 6.62 ct and measures apx. 12.18-12.2 x 7.28 mm., good symmetry and polish.  The diamond has a note of "VS-1/N", but appears to have a color grade in the range of "R-V" and in the clarity range of "VS".             21,500     20,000

3g.   One loose heart shape diamond: The diamond weighs apx. 4.03 ct. and measures apx. 11.1 x 10.78 x 5.27 mm., good symmetry and polish.  The diamond has a note of "SI-1/K", but appears to have a color grade in the range of "J-K" and a clarity grade of "SI-1".             19,600      7,500

3h.  One loose cushion shape natural sapphire:  The sapphire weighs apx. 18.2 ct. and measures apx. 17.15 x 13.5 x 8.32 mm., good symmetry and polish.  The color is medium-dark blue to violetish-blue and the clarity is lightly included to the unaided eye.                                              9,100        ---

3i.  One loose square emerald cut diamond:  The diamond weighs apx. 11.13 ct. and measures apx. 12.63 x 12.32 x 8.3 mm., good symmetry and polish.  The diamond has a note of "VVS-1/K", but appears to have a color grade in the range of "K-L" and in the clarity grade of "VS".                                                59,000      44,000

3j.  One loose round brilliant cut diamond:  The diamond weighs apx. 6.65 ct. and measures apx. 12.5-12.59 x 7.13 mm., good symmetry and polish.  The diamond has a note of "VS-1/N", but appears to have a color grade in the range of "Q-U" and in the clarity range of "VS".                                                22,000      24,000

3k.  One loose round brilliant cut diamond:  The diamond weighs apx. 7.74 ct. and measures apx. 13.42-13.45 x 7.28 mm., good symmetry and polish.  The diamond has a note of "I-1/I-J" and it appears to match this grading.                          35,800      27,000

3l.  One loose octagon shape diamond:  The diamond weighs apx. 18.28 ct and measures apx. 15.67 x 15.66 x 8.65 mm., good symmetry and polish.  The diamond is accompanied by a note of "Fancy Yellow/IF" color/clarity and "GIA #7085087."  The stone appears to match this grading.                                       210,000     210,000

3m.   One loose round brilliant cut diamond:  The diamond weighs apx. 4.32 ct. and measures aprx. 10.41-10.51 x 6.3 mm., good symmetry and polish.  The diamond is accompanied by a note of "Faint Blue/IF" color/clarity and "GIA #5117323."  The diamond was subsequently graded on GIA report #8812982 as "E" color, "VVS1" clarity (and marked potentially flawless).                        97,000     105,000

3n.   One loose emerald cut diamond: The diamond weighs apx. 3.35 ct. and measures apx. 10.01 x 7.5 x 4.84 mm., good symmetry and polish.  The diamond has a note of "F/IF" color/clarity "GIA #5186298".  The stone appears to match this grading.                            52,300      25,000

Total for 14 loose gemstones      1,109,100     764,600

Total                             1,292,500     843,700

APPENDIX B

| Property Description | Estimated Value Lower | Upper | Agreed Reserve | Auction Price | Carmona's Appraised Value |
|---|---|---|---|---|---|
| **Sold at Auction** | | | | | |
| *Jewelry* | | | | | |
| Lady's 18-kt. yellow gold, invisibly-set sapphire, and channel-set diamond ring (2a) | $2,000 | $3,000 | $1,800 | $1,800 | $1,500 |
| Lady's 18-kt. yellow gold, invisibly-set ruby, and channel-set diamond ring (2b) | 2,000 | 3,000 | 1,800 | 1,800 | 1,800 |
| Lady's 14-kt. yellow gold and diamond ring (2c) | 15,000 | 20,000 | 13,500 | 20,000 | 37,500 |
| 14-kt. yellow gold and diamond tie tack (2f) | 1,000 | 1,500 | 900 | 4,500 | 5,400 |
| Lady's 18-kt. yellow gold and diamond necklace (2h) | 30,000 | 50,000 | 27,000 | 32,000 | 44,000 |
| Lady's 18-kt. yellow gold, emerald, and diamond necklace (2i) | 20,000 | 30,000 | 18,000 | 19,000 | 56,000 |
| | 70,000 | 107,500 | 63,000 | 79,100 | 146,200 |
| *Loose Gemstones* | | | | | |
| Loose round brilliant-cut diamond weighing approximately 1.9 carats (3c) | 8,000 | 10,000 | 7,200 | 9,600 | 11,800 |
| Loose round brilliant-cut diamond weighing approximately 2.01 carats (3b) | 8,000 | 10,000 | 7,200 | 7,500 | 15,000 |
| Loose emerald-cut diamond weighing approximately 3.35 carats (3n) | 25,000 | 35,000 | 22,500 | 25,000 | 52,300 |
| Loose heart-shaped diamond weighing approximately 4.03 carats (3g) | 8,000 | 10,000 | 7,200 | 7,500 | 19,600 |
| Loose round brilliant-cut diamond weighing approximately 4.32 carats (3m) | 35,000 | 45,000 | 31,500 | 105,000 | 97,000 |

| | | | | | |
|---|---|---|---|---|---|
| Loose octagon-shaped yellow diamond weighing approximately 5.01 carats (3d) | 30,000 | 50,000 | 27,000 | 35,000 | 48,000 |
| Loose round brilliant-cut diamond weighing approximately 6.62 carats (3f) | 18,000 | 22,000 | 16,200 | 20,000 | 21,500 |
| Loose round brilliant-cut diamond weighing approximately 6.65 carats (3j) | 18,000 | 22,000 | 16,200 | 24,000 | 22,000 |
| Loose emerald diamond weighing approximately 7.57 carats (3e) | 28,000 | 32,000 | 25,200 | 30,000 | 48,000 |
| Loose round brilliant-cut diamond weighing approximately 7.74 carats (3k) | 30,000 | 50,000 | 27,000 | 27,000 | 35,800 |
| Loose square emerald-cut diamond weighing approximately 11.13 carats (3i) | 40,000 | 60,000 | 36,000 | 44,000 | 59,000 |
| Loose octagon-shaped diamond weighing approximately 18.28 carats (3l) | 100,000 | 150,000 | 90,000 | 210,000 | 210,000 |
| Loose modified rectangular-cut light fancy yellow diamond weighing approximately 40.02 carats (3a) | <u>140,000</u> | <u>160,000</u> | <u>126,000</u> | <u>220,000</u> | <u>460,000</u> |
| | <u>488,000</u> | <u>656,000</u> | <u>439,200</u> | <u>764,600</u> | <u>1,100,000</u> |
| | 558,000 | 763,500 | 502,200 | 843,700 | 1,246,200 |

<u>Not Sold At Auction</u>

<u>High Bid</u>

<u>Jewelry</u>

| | | | | | |
|---|---|---|---|---|---|
| Lady's 18-kt. yellow gold, sapphire, and diamond leaf necklace (2d) | 4,000 | 6,000 | 3,600 | $2,800 | 4,400 |
| Lady's 18-kt. yellow gold, ruby, and diamond leaf necklace (2e) | 5,000 | 7,000 | 4,500 | 3,800 | 5,800 |
| Cultured pearl necklace with 14-kt. white gold fishhook clasp (2g) | 1,000 | 1,500 | 900 | 650 | 400 |

| | | | | | |
|---|---|---|---|---|---|
| Lady's 18-kt. yellow gold, heart-shaped emerald, and diamond necklace (2j) | 15,000 | 20,000 | 13,500 | [1]-0- | 19,000 |
| Treated opal necklace with 18-kt. yellow and white gold, opal, and diamond pin/pendant (2k) | 3,000 | 5,000 | 2,700 | 2,600 | 7,600 |
| | 28,000 | 39,500 | 25,200 | 9,850 | 37,200 |

#### Loose Gemstone

| | | | | | |
|---|---|---|---|---|---|
| Loose cushion-shaped natural sapphire weighing approximately 18.2 carats (3h) | 14,000 | 16,000 | 12,600 | 10,000 | 9,100 |
| | 42,000 | 55,500 | 37,800 | 19,850 | 46,300 |
| Totals | 600,000 | 819,000 | 540,000 | —-- | --- |

[1]This item was withdrawn from the auction.

## APPENDIX C

| Consolidated Debt Outstanding[1] | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|
| Senior term notes, due in quarterly installments through Dec. 28, 1995 at lender's reference rate plus 1 1/2 percent (12%, 11.5%, 8%, and 7.5% at Dec. 31 of the respective years). Payment is secured by Sterling's assets (Dec. 31, 1991, book value of $25,683,252) and prepayments may be required if sufficient cashflow.[2] | $20,075,000 | $17,450,000 | $14,075,000 | $10,575,000 |
| Senior subordinated notes, due in two equal installments at Dec. 15, 1998 and 1999. Interest payments at 14 percent are due annually. Payment is unsecured and subject to the noted requirements of the senior term notes. | 2,450,000 | 2,450,000 | 2,450,000 | 2,450,000 |
| Subordinated notes, due in three installments at Mar. 15, 1996, 1997, and 1998. Interest payments vary from 13.5 to 14.5 percent (14%, 14%, 13,5%, and 13.5% at December 31 of the respective years) and are due quarterly. Payment is unsecured and subject to the noted requirements of the senior term notes. The additional $175,000 of notes shown for 1992 were issued on Oct. 23, 1992, as consideration for the holders of the subordinated notes waiving and amending certain covenants. | 9,000,000 | 9,000,000 | 9,000,000 | 9,175,000 |
| Series B subordinated debentures, due in three equal installments at Dec. 31, 1993, 1994, and 1995. Interest payments are due annually at incremental rates, increasing from 8 percent in 1989 to 12 percent in 1992 and thereafter. Payment is subject to the noted requirements of the senior term notes. | 1,428,000 | 1,428,000 | 1,428,000 | 1,428,000 |
| Unsecured notes, due June 29, 1990. Interest at 14 percent increasing to 18 percent past the due date. Payment is subject to the noted requirements of the senior debt. | 181,452 | 181,452 | 181,452 | 181,452 |
| Contractual obligation, discounted, secured by $400,000 series B subordinated debentures. | 400,000 | 400,000 | 400,000 | 400,000 |
| Unsecured notes payable, interest rates range from 11.25 to 12.5 percent, due in monthly installments through Nov. 1994. | 18,853 | 22,013 | 15,770 | -0- |
| Obligations under capital leases | 509,866 | 140,722 | 21,084 | -0- |
| Other | -0- | -0- | -0- | 8,716 |
| Total long-term debt | 34,063,171 | 31,072,187 | 27,571,306 | 24,218,168 |
| Less current portion | 2,942,325 | 3,671,964 | 3,709,589 | 3,921,015 |
| Long-term debt less current portion | 31,120,846 | 27,400,223 | 23,861,717 | 20,297,153 |

[1]The specific debtors on the consolidated debt listed below are: (1) Sterling--senior subordinated notes; series B subordinated debentures; unsecured notes, (2) TEI--senior term notes (jointly with QCI); subordinated notes (jointly with QCI); obligations under capital lease, and (3) QCI--contractual obligations; unsecured notes payable; obligations under capital leases.

[2]Sterling's other debt was all subordinate to the senior term notes and was restricted as to payment unless Sterling met certain financial criteria. In that this criteria had not been met as of the applicable valuation date, the restrictions had in previous years prevented Sterling from making any payment on the senior subordinated notes, subordinated notes, series B subordinated debentures, and unsecured notes. As of Jan. 15, 1991, and Dec. 31, 1991 and 1992, the amount of accrued interest due but restricted from payment was as follows:

| Class of Debt | Jan. 15, 1991 | Dec. 31, 1991 | Dec. 31, 1992 |
|---|---|---|---|
| Senior subordinated notes | $347,765 | $744,820 | $1,194,431 |
| Subordinated notes | -0- | 309,241 | 1,071,628 |
| Series B subordinated debentures | 291,132 | 488,889 | 711,294 |
| Unsecured notes | 48,645 | 82,936 | 129,198 |
| | 687,542 | 1,625,886 | 3,106,551 |